UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KARIM ANNABI

                              Prose Plaintiff,

*vs.*                                                        **Case No. 1:22-CV-03795 (LJL)**

NEW YORK UNIVERSITY

                              Defendant.

---

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

### TABLE OF CONTENTS

Pages

OPPOSITION TO PRELIMINARY STATEMENT.................................................................1

OPPOSITION TO PROCEDURAL HISTORY…………………………………………......3

OPPOSITION TO STATEMENT OF RELEVANT FACTS.....................................................3

OPPOSITION TO LEGAL STANDARD APPLICABLE TO THIS MOTION......................6

OPPOSITION TO POINT I - FED R. CIV. P. 8(A) VIOLATION.........................................7

OPPOSITION TO POINT II -  BREACH OF CONTRACT CLAIMS…...………….........8

OPPOSITION TO POINT III - DUPLIVATIVE CLAIMS…………………………….....9
    Opposition to Point A - Constructive/Fiduciary Trust.................................................9
    Opposition to Point B - Implied Covenant of Good Faith and Fair Dealing….….......10
    Opposition to Point C - Common-law and Constructive Fraud Claims……………...10
    Opposition to Point D - Promissory Estoppel…………………………………………..11
    Opposition to Point E - Unjust Enrichment…………………………………………….11

OPPOSITION TO POINT IV - CONSTRUCTIVE/FIDUTIARY TRUST…………………12

OPPOSITION TO POINT V - BREACH OF THE IMPLIED COVENANT OF GOOD
FAITH AND FAIR DEALING/FAILURE TO STATE A CLAIM…………………………12

OPPOSITION TO POINT VI - COMMON LAW CLAIMS………………………………15

Opposition to A - Failure to Plead the Elements of the Claim…………………….15
Opposition to B - Negligent Misrepresentation……………………………….....15
Opposition to C - Promissory Estoppel………………………………………….16
Opposition to D - Unjust Enrichment……………………………………….…....16
Opposition to E - Breach of Fiduciary Duty……………………………………….17

OPPOSITION TO POINT VII - PLAINTIFF FAILS TO PLEAD A CAUSE
OF ACTION, DISCRIMINATION OR RETALIATION UNDER TITLE VI………...17

OPPOSITION TO POINT VIII - THE GROVE CITY BILL/TITLE IX……………….21

NON-OPPOSITION TO POINT IX - DISCRIMINATION OR
RETALIATION UNDER THE ADA………………………………………………..27

NON-OPPOSITION POINT X - NYSHRL & NYCHRL
CLAIMS…………………………………………………………………………..27

OPPOSITION TO POINT XI - FALSE ADVERTISING TO THE PUBLIC/  GBL…….27

OPPOSITION TO POINT XII - PLAINTIFF CANNOT SUBSTANTIATE NYU
COMMITTED FALSE ADVERTISING TO THE PUBLIC AT LARGE……………….34

OPPOSITION TO POINTS XIV - INJUCTIVE RELIEF………………………………..36

OPPOSITION TO POINT XV - DIVERSITY & JURISTICTION………………………37

OPPOSITION TO POINT XVI - PUTATIVE CLASS ACTION DISMISSAL…………37

OPPOSITION TO POINT XVII - NONRELEVANT ALLEGATIONS………………...38

OPPOSITION TO POINT XVIII - SANCTIONS………………………………………39

CONCLUSION……………………………………………………………………..39

## TABLE OF AUTHORITIES

*Watts v. Services for the Underserved*, 2007 WL 1651852 *2 (E.D.N.Y. June 6, 2007)...........................................................................................................6

*Dooley v. Wetzel*, 957 F.3d. 366, 374 (3d Cir. 2020). ...........................................6

*Phillips v. County of Allegheny*, 515 F.3d 224, 229 (3d Cir. 2008);......................7

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007)..........................................................7

*Still v. DeBuono*, 101F.3d 888, 891 (2d. Cir.1996)................................................7

*Manolov v. Borough of Manhattan Cmty*. Coll., 952 F. Supp. 2d 522 (S.D.N.Y. 2013).........7

*Flores v. N.Y.C. Human Res. Admin.*, No. 10 Civ. 2407(RJH), 2011 WL 3611340, at * 1 n. 1 (S.D.N.Y. Aug. 16,2011)…..................................................................7

*Ceparano v. Suffolk Cnty.*, No. 10 Civ. 2030 (SJF) (ATK), 2010 U.S. Dist. LEXIS 134605...............................................................................................................7

*Benzo v. New York State Div. of Human Rights*, No. 95 Civ. 5362 (LAP), 1997 U.S. Dist. LEXIS 901, *9 (S.D.N.Y. Jan. 29, 1997)...............................................7

*Haines v. Kerner* 404 U.S. 519 (1972).................................................................8

*Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 93 (2d Cir. 2011).......................................................................................................8

*Cheves v. Columbia Univ.*, 89 A.D.3d 463, 464 (1st Dept. 2011)..........................8

*Bosch v. NorthShore Univ. Health Sys.* , 2019 IL App (1st) 190070.....................8

*Brandon Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [ 277 Cal.Rptr. 40].)…………………………………………………………….9

*Meyers v. Waverly Fabrics,* 65 N.Y.2d 75, 80, n 2 [1985]...................................10

*North Shore Bottling Co. v. Schmidt Sons*, 22 N.Y.2d 171, 179............................10

*Albemarle Theatre v. Bayberry Realty Corp.,* 27 A.D.2d 172, 175 [1st Dept 1967]..............10

*Bailey v. New York Law Sch.,* No. 16 Civ. 4283 (ER), 2017 U.S. Dist.).............10

*Spychalsky v. Sullivan*, No. 01 Civ. 0958 (DRH) (ETB), 2003 U.S. Dist. LEXIS 15704, at *45 (E.D.N.Y. Aug. 29, 2003)............................................................10

*Mandelblatt v. Devon Stores,* 132 A.D.2d 162 (N.Y. App. Div. 1987)................10

*Nash v. New School,* 05 Civ. 7174 (KMW) (FM) (S.D.N.Y. Apr. 29, 2009)........10

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996)................................................................................................................10

*Papa's-June Music, Inc. v. McLean,* 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996)...................10

*Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302-3 (1st Dept. 2003)......................................................................................................10

*Kramer v. Alpine Valley Resort*, 108 Wis. 2d 417 (Wis. 1982)..............................................11

*Burton v. Iyogi, Inc.,* 13-CV-6926 (DAB) (S.D.N.Y. Mar. 16, 2015)....................................11

*Net2Globe Int'l, Inc., v. Time Warner Telecom of N.Y.,* 273 F.Supp.2d 436, 466 (S.D.N.Y. 2003)………………………………………………………………….......11

*Schwartz v. Asplundh Tree Expert Co. Inc.,* 103 F.3d 660,663 (2d Cir. 1996)......................12

*Mirchel v. RMJ Secs. Corp.*, 613 N.Y.S.2d 876, 879 (N.Y. App. Div. 1994)........................12

*Hores v. Sargent*, 230 A.D.2d 712, 712, 646 N.Y.S.2d 165)..................................................12

Sofair v. State Univ. of New York Upstate Med. Center Coll. of Medicine, 54 A.D.2d 287, 290 (4th Dep't 1976)............................................................................................14

 *Keles v. New York Univ.*, No. 91-cv-7457, 1994 WL 119525, at *6 (S.D.N.Y. April 6, 1994)...............................................................................................................14

*Brittain v. Trs. of Columbia Univ.* 20-CV-9194 (PKC), at *4 (S.D.N.Y. Aug. 11, 2021)...............................................................................................................14

*Patterson v County of Oneida*..................................................................................17

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)......................................................19

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).......................................19

*Diamond v. Colonial Life & Acc. Ins. Co*., 416 F.3d 310, 318 (4th Cir. 2005)......................19

*Costa v. Desert Palace, Inc.,* 299 F.3d 838, 855 (9th Cir. 2002), aff'd, 539 U.S. 90 (2003).............................................................................................................19

*Kajoshaj v. New York City Department of Education*, 543 F. App'x 11, 14 (2d Cir.2013)...........................................................................................................19

*Manolov v. Borough of Manhattan Cmty. Coll.,* 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) .............................................................................................................20

*Costigan v. CitiMortgage, Inc*..................................................................................23

*Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 339, 344  [1999]............................24

*Karlin v IVF Am., Inc.*, 93 NY2d 282, 289, 293 [1999])...........................................24

*Himmelstein v. Matthew Bender & Co.*, 37 N.Y.3d 169 (N.Y. 2021)....................................24

*De Santis v. Sears, Roebuck and Co., 148* A.D.2d 36, 38, 543 N.Y.S.2d 228, 229 (3d Dep't 1989)......................................................................................................26

*Guggenheimer v. Ginzburg, 43* N.Y.2d 268, 401 N.Y.S.2d 182, 372 N.E.2d 17, 19............26

*Koch v. Acker, Merrall & Condit Co*.....................................................................29

*Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).................30

 *Miller v. Kaminer*, 88 N.Y.S.3d 792 (N.Y. Civ. Ct. 2018)....................................30

*Manchanda v. Navient Student Loans & Educ. Credit Mgt. Corp*.........................................30

*Bezuszka v. L.A. Models*....................................................................................31

De *Fink v. Time Warner Cable* , 714 F.3d 739, 741 (2d Cir. 2013).....................................32

*Buonasera v. Honest Co.* , 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016)................................32

*Eidelman v. Sun Prods. Co.* , No. 16 Civ. 3914 (NSR), 2017 WL 4277187, at *3 (S.D.N.Y. Sept. 25, 2017).. ...................................................................................32

*Kacocha v. Nestle Purina Petcare Co.* , No. 15 Civ. 5489 (KMK),
 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016)……………………………...............32

*Guzman v. Mel S. Harris and Associates, LLC*....................................................33

*DaCorta v. AM Retail Grp.* , No. 16 Civ. 1748 (NSR),
2018 WL 557909, at *7 (S.D.N.Y. Jan. 23, 2018)……….....................................................33

*Small v. Lorillard Tobacco Co.* , 94 N.Y.2d 43, 56, 698 N.Y.S.2d 615,
720 N.E.2d 892 (1999)…………………………………………………………….….33

*Sussman-Automatic Corp. v. Spa World Corp*., 15 F. Supp. 3d 258, 269 (E.D.N.Y. 2014)......................................................................................................34

*Time Warner Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 153 (2d Cir. 2007).................34

*N. Am. Olive Oil Ass'n v. D'Avolio Inc*., 457 F. Supp. 3d 207 (E.D.N.Y. 2020)..................34

*S.C. Johnson & Son,* 241 F.3d at 238.................................................................34

*George Basch Co. v. Blue Coral, Inc*., 968 F.2d 1532, 1537 (2d Cir. 1992).......................35

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324,
127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).................................................................................35

*Chiste v. Hotels.com L.P.*.......................................................................................................36

*Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)...............................37

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)..............................................37

*Bates v. Offit Kurman Attorneys at Law LLP*, 19 Civ. 2814 (KPF)
(S.D.N.Y. Dec. 20, 2019).......................................................................................................37

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567 (2004)..........................................37

*Conolly v. Taylor*, 2 Pet. 556, 565........................................................................................37

*Kassman v. KPMG LLP.*, 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013)................................38

*Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012)............38

*Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012)..............................38

*Kashmiri v. Regents of University of California,* 156 Cal.App.4th 809
(Cal. Ct. App. 2007)……………………………………………………………....…38

*Haskell v. Time, Inc.,* 965 F. Supp. 1398 (E.D. Cal. 1997).................................................39

## **DECLARATION**

Karim Annabi ("Plaintiff") pursuant to 28 U.S.C. § 1746, hereby declares according to the laws of the United States and under penalty of perjury that the facts alleged are based on my own personal knowledge and experience and submits this Memorandum of Law in opposition to New York University's ("Defendant" or "NYU") Motion to Dismiss ("MTD").

Defendant submits a MTD by attorney Joseph DiPalma, who falsely swears in his Affirmation (Dkt. 47 Pg.1) that he is fully familiar with the facts and circumstances, when in fact he displays scant knowledge of the facts and relies exclusively on regurgitations of NYU administrator hearsay emails to formulate his defense. As the facts are easily obtainable, the Defendant has not exercised the reasonable inquiries required by Rule 11 despite being afforded multiple deadline extensions. This ignorance of the facts is a common theme in the MTD, which is further undermined by copious citations of irrelevant or contradictory authorities. Attorney DiPalma even fabricates key facts in bad faith to justify NYU's illegal actions, and thus all Defendant's opposed points should be dismissed as a matter of law.

## OPPOSITION TO PRELIMINARY STATEMENT

Defendant is mistaken from the outset and is in fact correctly named in the Amended Complaint. Defendant also falsely states Plaintiff is "seeking a second bite of the apple," yet cites no previous decisions or litigation. Contrary to the Defendant's assertions throughout the MTD, the allegations in Plaintiff's Amended Complaint are not conclusory. The facts show that Plaintiff entered into four implied contracts with the Defendant where the terms were not upheld and resulted in injuries, some of which are shared with potentially thousands of other individuals spanning more than a decade. In addition, there is substantial evidence in support of discriminatory exclusions that the Defendant fails to properly explain.

The MTD falsely states, "The Amended Complaint relies on Plaintiff's subjective belief that he was entitled to win a contest and after being rejected." (Pg. 2) Plaintiff believes he is only entitled to the alumni entrepreneurship support services for which he paid, and a legal and non-discriminatory selection process in the contests he entered. In regards to the Challenge contest, the Defendant admits and the evidence proves, that Plaintiff fulfilled all eligibility criteria and that his application was in full conformity with NYU's very specific guidelines (Opp. Ex.1). These guidelines were strict, as Berkley Center Director Franklin

1

explains, "We have guidelines [Concept Summary] that spell out very clearly how you will be evaluated" and "We have a very extensive guidebook of what we're looking for." These guidelines include, "Please follow these instructions EXACTLY as described. No exceptions. Failure to do so could result in your Concept Summary not being evaluated." (Opp. Ex. 12)

It is undisputed that Plaintiff met the very specific criteria required by the guidelines. With a promise of 25 to 35 winning spots, is not a feeling of entitlement, but a legal obligation by the Defendant to select the Plaintiff with three to five empty spots remaining. The evidence also proves that the Defendant knew years in advance that they had no intention of selecting the number of advertised spots. Assistant Director Lafuente states in a YouTube chat from several years ago, "We don't have a set amount of teams we aim to take," making the advertising which promises 25 to 35 winning spots in the 2021-2022 and 2022-2023 Challenge contests (and potentially others) fraudulent. (Opp. Ex. 2)

Any outcome other than NYU selecting the advertised number of winners, and paying out the stated prize money, would open the flood gates for contest promoters to illegally profit by overstating the prize money and the promised number of winners. Unethical promoters would be able to choose an arbitrary number of winners and prize money as low as their ethics allow, completely detached from the advertising. Applying the Defendant's logic for example, a promoter can falsely advertise a contest promising that one million winners, chosen by third-party Judges, will all win $1 million. With an entry fee of $100, the promoter could pocket $100M (minus expenses) and choose only one winner using Judges in his employment and pay out only $1 to the one winner. While an exaggeration, Defendant would consider this scenario legal, and any contestants seeking justice would also be labelled "desperate," and would be making "conclusory allegations in support of baseless theories of wrongdoing," as the Defendant has labelled Plaintiff (Pg. 1). Defendant further states, "it is not against equity to allow NYU to keep this fee [$100] as Plaintiff's contest entry was

evaluated for its merits," (Pg. 21) which clearly highlights the logical conclusion that they would also believe that selecting only one winner out of the promised one million would be legal. Fortunately, the law doesn't determine false advertising, fraud, and breach of contract by the size of the illicit gains. The Defendant's acts in this dispute are therefore as abhorrent as the above scenario, or worse, since the Defendant preys on minors, students and alumni who are most likely in student debt, while also engaging in discrimination.

Defendant also states that injunctive relief must be denied as there is no allegation of ongoing harm. There is ongoing harm to Plaintiff as he remains a victim of discrimination by the Defendant, and unable to benefit from the implied contracts and their promised terms for which he paid the Defendant hundreds of thousands of dollars.

## OPPOSITION TO PROCEDURAL HISTORY

Defendant falsely states, "On November 9, 2022, Plaintiff filed his First Amended Complaint, alleging several new claims, including breach of an implied contract." (Pg. 3) The original complaint (Dkt. 1) included broken implied contracts as the first two points. The Defendant also admits to being granted deadline extensions (only some of which are mentioned in the Procedural History), during which they promised they would use the time to study the facts and perform the necessary reasonable inquiries under the circumstances. It is apparent however that Defendant failed to do so in violation of Rule 11.

## OPPOSITION TO STATEMENT OF RELEVANT FACTS

The Defendant's entire argument is based on a statement of "Relevant Facts" that are actually not facts, but unsworn NYU administrator statements or hearsay. The underlying facts they are based on are either completely disregarded or manipulated in bad faith to perverse justice. If the the issue at hand is Plaintiff being cut from a sports team, the Defendant's "relevant facts" are statements from the coach that Plaintiff made no jump shots, when the underlying facts are that the sport was soccer, not basketball. In this case, Defendant

quotes NYU administrators and Judges, "The [Hackathon rejection] letter stated in relevant part, "[t]he ventures selected were those with the strongest demonstrations of problem-solution fit and alignment with the specific goals of hackathon," and, "The [Challenge] rejection letter stated in part, "the teams that were selected were deemed to have the strongest rationale for how to create, deliver, and capture value in their markets." (Pg. 4)

The above statements are void of meaning without the relevant context. The underlying facts to correctly frame them are that the Challenge contest rules state that the 25 to 35 strongest teams who meet the contest selection criteria, and not 22 (potentially only 20) teams based on arbitrary metrics would be selected. The word "strongest" is a superlative to compare 25 eligible teams, not 22. While 22 may indeed have stronger rationales, it does not preclude Plaintiff from having the 23rd, 24th or 25th strongest rationale. The above NYU statements are therefore deceptive as well as circular logic: "Defendant was fair, proven by Defendant's statements that they were fair." This logic is additionally faulty when one of the allegations is that third-party Judges were not used as advertised in the promotional videos, leading to conflicts of interests that undermined meritocracy.

Another red herring argument is that Plaintiff's Challenge submission was deficient, "In a review session after Plaintiff's rejection from the Challenge, Plaintiff was informed that more clarity was needed." (Pg. 5) The guidelines however clearly state that, "The Concept Summary is a high-level document. It's not meant to be all-encompassing. Teams accepted into the program will be required to describe their ventures in far greater detail at a later stage" (Opp. Ex. 12). Moreover, the eligibility agreement (Opp. Ex. 13) states, "Concept revisions: Teams are fully expected to revise, refine, and improve their venture concepts and business models." A Challenge promotional video (Dkt. 37 ¶ 7) even shares a testimonial where a previous prize winner states, "NYU pointed out gaps in our plan, that you don't have

this, or you missed that, that iterative process of learning from your peers, from venture capitalists, from Judges."

Defendant's statements that the "Berkley Center for Entrepreneurship is committed to helping you advance your venture" (Pg. 5) are also irrelevant when the evidence proves Plaintiff was banned. Defendant provides no evidence of this purported commitment to support Plaintiff. Start-up advising offers prototyping help sessions for example, but Plaintiff remains banned from registering despite the condition that he needs to develop a prototype. Further evidence that the prototype condition was pretext for discrimination is that Associate Director Punzalan states in a Challenge contest promotional video, "There is an asterix [next to prototype], we recognize having a prototype might not be 100% reasonable for every single company...if you have a complicated technology where the build out would take years and years maybe you don't have a prototype yet." (Dkt.37 P. 8 Ex. 7) Even though the exception of complicated technology describes Plaintiff's venture, and the fact that he still had an early prototype, Defendant maintains the discriminatory condition to build a prototype. Defendant's MTD goes so far as to feign total ignorance of all three conditions. (Pg. 25)

The only underlying facts the MTD relies on are dishonest. The Defendant states in bad faith, "Plaintiff utilized these [eight] advising sessions to discuss his startup, Activate, with NYU's social media in-house expert (Dkt. 37. Pg. 43 P ⁋ 78). However, after attending eight appointments over the course of several weeks, Plaintiff's access was capped due to the "very limited resource." (Dkt.37. Pg. 37-38, ⁋ 66)"(p.5). The Defendant submits no evidence to prove that Plaintiff attended eight sessions with the social media in-house expert because if they did, they would reveal that Plaintiff attended only one mandatory session and five voluntary sessions covering four topics, or 6 total (Dkt 37. Pg. 38 ⁋ 67). Discovery in this case will expose Defendant's dishonesty using their own records, which will also show that Plaintiff remains banned from registering for start-up advising (Dkt 37. Ex. 17 & Opp. Ex 9).

Even if the Defendant's eight sessions false claim is taken at face value, it represents less than 35% of the more than 23 advising topics offered by the Berkley Center. (Opp. Ex. 3) Moreover, NYU's rules state there is "no limit" and "you can make as many appointments as you need, and in the different areas you may need assistance with. We actually encourage people to come back and make multiple appointments with us." (Dkt 37. Ex 40) NYU's "no limit" policy is consistent with NYU administrators boasting on video of founders who made significant use of their services. These administrators also share advice on video that eventual winners were often those who had used their resources the most. Britt Martin, a white female founder and previous winner in an earlier edition of the Challenge, states on video, "We signed up to every possible thing that was going on," yet was not capped.

Defendant provided no evidence that they banned other individuals, or provided any examples that five voluntarily booked sessions is out of the ordinary. Remarkably, Berkeley Center Assistant Director Lafuente writes to others, "Even if you don't make it [in the Challenge], you can get coaching through the Berkley Center's help desks/startup advising services." (Opp. Ex. 4) Plaintiff however continues to be "capped" post rejection.

## OPPOSITION TO LEGAL STANDARD APPLICABLE TO THIS MOTION

The Courts states, "A claim is frivolous only where it depends 'on an 'indisputably meritless legal theory' or a 'clearly baseless' or 'fantastic or delusional factual scenario.'" *Dooley v. Wetzel,* 957 F.3d. 366, 374 (3d Cir. 2020). Furthermore, "At the motion to dismiss stage for failure to state a claim, we test the sufficiency of the complaint, not the merits of the case." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996). Contrary to Defendant's assertions, Plaintiff submits a sufficient complaint that is not "clearly baseless" or a "fantastic or a delusional factual scenario," as demonstrated by the submitted evidence.

Moreover, "In the context of a motion to dismiss, this Court must, as always, assume that all allegations set forth in the complaint are true and draw all inferences in favor of the

non-moving party," *Watts v. Services for the Underserved*, 2007 WL 1651852 *2 (E.D.N.Y. June 6, 2007). "The Courts must take them in the light most favorable to a pro se Plaintiff, and construe pleadings particularly liberally when they allege civil rights violations." *Phillips v. County of Allegheny*, 515 F.3d 224, 229 (3d Cir. 2008); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Because Plaintiff proceeds pro se, his pleading is liberally construed and his complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." In addition, "A defendant's motion is to be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono*, 101F.3d 888, 891 (2d. Cir.1996). Plaintiff has provided an abundance of facts in support of his civil rights and other claims.

Finally, the Court may also rely on Plaintiff's MTD opposition to assess the legal sufficiency of the complaint. See *Manolov v. Borough of Manhattan Cmty.* Coll., 952 F. Supp. 2d 522 (S.D.N.Y. 2013) "In view of his pro se status, the Court also may rely on Manolov's opposition papers in assessing the legal sufficiency of his claims. See *Flores v. N.Y.C. Human Res. Admin.*, No. 10 Civ. 2407(RJH), (S.D.N.Y. Aug. 16, 2011).

## **OPPOSITION TO POINT I - FED R. CIV. P. 8(A) VIOLATION**

Defendant makes a frivolous defense when comparing Plaintiff's 60 pages and one defendant Amended Complaint with the more than 250 pages and more than 400 defendants complaint in *Ceparano v. Suffolk Cnty.*, No. 10 Civ. 2030 (SJF) (ATK), 2010 U.S. Dist. The latter complaint was described as "unintelligible" while Plaintiff's Amended Complaint is objectively legible. Similarly, Defendant submits an authority in support where the pro se Plaintiff wrote a 444-page complaint. See *Benzo v. New York State Div. of Human Rights*, No. 95 Civ. 5362 (LAP), 1997 U.S. Dist. *9 (S.D.N.Y. Jan. 29, 1997) Again, this example of 444 pages is incomparable to Plaintiff's 60 pages. Furthermore, "the Courts have sufficient discretion to take account of the special circumstances that often arise in pro se situations," in

regard to complaint deficiencies for example, "allegations such as those asserted by [pro se] petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence." See *Haines v. Kerner* 404 U.S. 519 (1972).

### OPPOSITION TO POINT II -  BREACH OF CONTRACT CLAIMS

It is well established in American law that there exists an implied contract between students and universities and the terms are "contained in the university's bulletins, circulars and regulations." *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 93 (2d Cir. 2011) (quoting *Vought,* 127 A.D.2d at 654); "Such terms are binding on the parties, independent of whether the university so intended, and regardless of whether the student knew of them or understood them to be a part of the contract. Moreover, "To survive dismissal on such a claim, the student need not cite any written materials at all." See *Bosch v. NorthShore Univ. Health Sys.* , 2019 IL App (1st) 190070." Defendant wrongly states that Plaintiff's student/alumni status does not create implied contracts with NYU. These contracts do exist and even have specific alumni terms such as the following, "Alumni Entrepreneurship: Alumni Benefits & Resources: Alumni can explore entrepreneurship support [at the Berkley Center]." (Dkt. 37. P. Ex. 4 & Opp. Ex. 5).

Defendant erroneously cites *Cheves v. Columbia Univ.*, 89 A.D.3d 463, 464 (1st Dept. 2011). Cheves was restricted from physically using the campus at will. The Court found that, "although the Alumni Relations brochure lists certain benefits and services generally available to alumni, nothing in that document guarantees unfettered, irrevocable access for alumni to the campus or its facilities." The Court did not find an unfettered access benefit in the brochures, which proves Plaintiff's position that specific promises constitute contract terms.

Defendant cites *Spychalsky v. Sullivan*, No. 01 Civ. 0958 (DRH) (ETB), 2003 U.S. Dist., at *45 (E.D.N.Y. Aug. 29, 2003) to claim that Plaintiff's degrees do not create a lifetime contract, but this citation is disingenuously taken out of context. In *Spychalsky,* "The

specific promise cited by Plaintiff was the promise in its admissions materials and handbooks regarding compliance with 'all federal, state and local laws." The Court deemed that the Plaintiff's claims had no relationship with that vague promise. Nowhere does the decision state that the implied contract with student holding specific alumni promises ends at graduation. Plaintiff's evidence on the other hand proves that NYU's materials do make specific promises of a lifetime of alumni services, such as "lifelong learning," career services "at every stage of their career," and "entrepreneurship support at Stern." (Opp. Ex 5) The Challenge FAQ page also states, "The Berkley Center for Entrepreneurship provides a number of programs and services to support NYU community members with an interest in creating new ventures. The Center provides startup acceleration programs, mentoring, workshops and technical assistance, all designed to provide NYU students, <u>alumni,</u> faculty and staff with the skills and resources needed to discover and execute bold new ideas."

Also relevant, "In the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. (Civ. Code, § 3300.) The aim is to put the injured party in as good a position as he or she would have been had performance been rendered as promised. (See, e.g., *Brandon Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [ 277 Cal.Rptr. 40].) Performance in this case would mean that Defendant provides Plaintiff the value of the open contest spot he was denied and all benefits of the program, as well as over a year of missed startup advising and other NYU entrepreneurship benefits programs from which he has been excluded.

### OPPOSITION TO POINT III – DUPLIVATIVE CLAIMS

#### Opposition to Point A - Breach Of Constructive/Fiduciary Trust

The Courts state, "It is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself. (*Meyers v.*

*Waverly Fabrics*, 65 N.Y.2d 75, 80, n 2 [1985]; *North Shore Bottling Co. v. Schmidt Sons,* 22 N.Y.2d 171, 179; *Albemarle Theatre v. Bayberry Realty Corp*., 27 A.D.2d 172, 175 [1st Dept 1967].) "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." (*Restatement [Second] of Torts* § 874, comment a.) *Mandelblatt v. Devon Stores*, 132 A.D.2d 162 (N.Y. App. Div. 1987). Defendant has a duty to the Plaintiff in the context of the contests contracts, as well as in the over-arching student/alumni-university relationship.

### Opposition to Point B - Breach Of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's claim is not duplicative as, "Where there is evidence that one party exercised a contractual right malevolently as part of a scheme to deprive the other party of its bargain, a claim for breach of the implied covenant of good faith and fair dealing may stand alongside a claim for breach of contract. See *Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302-3 (1st Dept. 2003). Defendant has exercised their contractual rights not to serve Plaintiff malevolently to deprive him of his bargain.

### Opposition to Point C - Common-law and Constructive Fraud Claims

Defendant inappropriately references *Nash v. New School*, 05 Civ. 7174 (KMW) (FM) (S.D.N.Y. Apr. 29, 2009), which in fact supports the fraud claims. *Nash* states that, "If a plaintiff sufficiently alleges that a defendant (1) owed the plaintiff a duty to disclose, and (2) omitted what was, at the time, a present fact, a plaintiff establishes a fraud claim that is sufficiently separate and distinct from a claim for breach of contract so as to be allowed to plead both causes of action." *Bridgestone/ Firestone, Inc. v. Recovery Credit Servs*., Inc., 98 F.3d 13, 20 (2d Cir. 1996)); see also *Papa's-June Music, Inc. v. McLean,* 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996) (collecting cases holding that a breaching party's failure to discharge the breaching party's duty to disclose can create a basis for the non-breaching party to plead both fraud and contract claims) This is so even if the allegedly fraudulent omission also

induced a contract. *Merrill Lynch*, 500 F.3d at 184, which also states that, "(suggesting that concealed information that would have made contracted-for obligations less valuable gives rise to a fraud action sufficiently independent of a claim for breach of contract)." Defendant has concealed information about operating illegal contests, which are separate and distinct claims from the broken terms of the implied contest contracts with Plaintiff.

### Opposition to Point D - Promissory Estoppel

Contrary to Defendant's assertions, NYU had a duty independent of the arising contracts and Plaintiff does not have a duplicative claim, "where the contract executed by the parties represents a minor aspect of a larger business relationship, we cannot agree with Alpine Valley's general proposition. In situations where the contract fails to embody essential elements of the total business relationship of the parties, we conclude that the existence  of a contract does not bar recovery under promissory estoppel." See *Kramer v. Alpine Valley Resort*, 108 Wis. 2d 417 (Wis. 1982). Defendant's duty to offer the Plaintiff alumni services is independent of the broken contest implied contracts as they fail to embody the total business relationship of the two parties. Furthermore, Defendant has a governmental mandated duty to students/alumni that is independent of the implied contract relationship with students/alumni.

### Opposition to Point E - Unjust Enrichment

In regards to Unjust Enrichment, "[C]ourts generally dismiss claims for *quantum meruit* on the pleadings only when it is clear from the face of the complaint that there exists an express contract that clearly controls."). *Burton v. Iyogi, Inc.*, 13-CV-6926 (DAB) (S.D.N.Y. Mar. 16, 2015), "Moreover, even if there were a contract, it is well-settled that parties may plead in the alternative. Fed. R. Civ. P.  8(d)(2)-(3). Particularly where, as here, there are allegations of fraud in the inducement and a dispute as to whether a valid contract exists, parties can and routinely do plead in the alternative fraud, unjust enrichment, and breach of contract." See *Net2Globe Int'l, Inc., v. Time Warner Telecom of N.Y.*, 273

F.Supp.2d 436, 466 (S.D.N.Y. 2003) ("The dispute over the validity of [the] contracts permits [plaintiff] to assert unjust enrichment as an alternative to breach of contract, and . . . unjust enrichment may serve as a basis for recovery should a trier of fact determine that, in fact, no valid contract was formed or that the contractual obligations did not encompass the events underlying . . . [plaintiff]'s unjust enrichment claim." (citing *Schwartz v. Asplundh Tree Expert Co. Inc.*, 103 F.3d 660,663 (2d Cir. 1996)). See also *Mirchel v. RMJ Secs. Corp.*, 613 N.Y.S.2d 876, 879 (N.Y. App. Div. 1994) (unjust enrichment plead in the alternative to contract claim). Plaintiff here is thus permitted to plead both.

### OPPOSITION TO POINT IV – CONSTRUCTIVE/FIDUTIARY TRUST

Plaintiff's claim alleging breach of constructive/fiduciary trust based on the *in loco parentis* should not be dismissed because while New York has generally rejected this doctrine at the college level, there are exceptions: "A duty may be imposed upon a college where it has encouraged its students to participate in an activity and taken affirmative steps to supervise and control the activity (see *Hores v. Sargent*, 230 A.D.2d 712, 712, 646 N.Y.S.2d 165). NYU administrators are on the record encouraging Plaintiff, high school and other student contestants to participate in their contests (an activity) and has taken affirmative steps to supervise and control these contests (the activity), which is in line with the exceptions rule.

### OPPOSITION TO POINT V - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING/FAILURE TO STATE A CLAIM

Plaintiff does not fail to state a claim and throughout the Amended Complaint pleads multiple specific allegations in support. The Defendant also falsely states that the Challenge decision making criteria was unknown to the Plaintiff. Defendant states, "despite [Plaintiff] not being a judge and not knowing the full decision making criteria." (P.17) The full decision making criteria was known (Concept Summary, PowerPoint presentations, etc) and stating that it was not unknown decision would prove that the Defendant applied arbitrary criteria.

This arbitrary criteria is proven by the Defendant highlighting a Judge's comment that

Plaintiff did not have financial modelling, when in fact that was not required by the guidelines. The Hackathon was also extremely specific in regards to the number of slides submitted and the information on each slide. Another example of arbitrary decision making is Plaintiff providing two visual exhibits in his appendix (Dkt, 37. Ex 69), yet one of the Judges states that the submission required visuals. Numerous other Judges' comments along the same lines would lead a neutral observer to conclude that the selection process is fraudulent and arbitrary, which, amongst other reasons, by law renders the contests illegal lotteries. Overall, the Defendant here is deceptively attempting to conflate Judges' comments with selection criteria, which only proves the arbitrary nature of the selection process and find pretext for the discrimination.

Defendant also falsely misrepresents Plaintiff by claiming he believes he is guaranteed entry simply by entering. Plaintiff unsuccessfully applied to the 2021-2022 "Google NYC Recovery Challenge" venture contest and took no issue with that decision. Portraying Plaintiff as entitled and unreasonable is simply another red herring. The facts are that this complaint only arose at the end of a sequence of events (Hackathon rejection, partial-ban, Challenge rejection, full ban with discriminatory conditions) where the compounded illegality was finally too blatant and personal to ignore. Furthermore, Plaintiff wrote to NYU administrators giving them a chance to do the right thing, lift the bans and choose the promised number of winners, yet Defendant was dismissive. Instead, NYU administrators have chosen to bury their heads in the sand and resort to their tried and tested legal superiority in a "might over right" legal battle. The only sense of privilege in this dispute is from the Defendant who believe they are unaccountable to anyone and are above the law.

Contrary to Defendant's assertions, Plaintiff also doesn't self-evaluate his entry as one that met the criteria and then assumes that he would have been chosen. As previously stated, NYU evaluated Plaintiff and his submission, and determined both are eligible to participate in

the Hackathon and Challenge. Director Punzalan states in the contest promotional video, "We will review only fully completed applications" (Dkt 37. Ex. 7) and also, "only eligible contestants will be reviewed." Judges even admit that Plaintiff is "credentialized," and that "the concept of Activate is intriguing," "The potential is visionary and commendable" and "the value proposition and strategy is engaging." A side by side analysis also demonstrates that every selection question was addressed by the Plaintiff in his submission. (Opp. Ex. 1)

It is critically important to highlight that Defendant's MTD even admits to the selection promise stating, "[Plaintiff] then assumes had NYU chosen the promised number of entries [25 to 35], his would have been chosen." (Pg. 17) The Plaintiff and the entire putative class paid for this unfulfilled promised, and it is the first such admission in this dispute. The entire argument that there was no implied contract is therefore undermined by this admission.

Defendant inexplicably also states on the same page that, "NYU made no promises of guaranteed results for entering its competitions," yet provides no proof of such disclaimers. "The promised number of entries" statement is proof of a guarantee for entering the competition. Implicitly, if a contestant is deemed eligible and submits a completed application according to the specific guidelines which is undisputed, the promise of 25-35 winners is a guarantee that Plaintiff would be selected if there are empty spots. The alternative in conjunction with the bans and unfair conditions is blatant fraud and discrimination.

Precedent also establishes that implied contracts are breached, "…where the educational institution is alleged to have acted arbitrarily, capriciously, or in bad faith, thereby breaching the implied contract with its students. See, e.g., *Sofair v. State Univ. of New York Upstate Med. Center Coll. of Medicine*, 54 A.D.2d 287, 290 (4th Dep't 1976). This is because "the essence of the implied contract [with a student] is that an academic institution must act in good faith in its dealings with its students." *Olsson,* 49 N.Y.2d at 414; see also *Keles v. New York Univ.*, No. 91-cv-7457, 1994 WL 119525, at *6 (S.D.N.Y. April 6, 1994) *Brittain v. Trs.*

14

*of Columbia Univ.* 20-CV-9194 (PKC), at *4 (S.D.N.Y. Aug. 11, 2021). As demonstrated in this memorandum and in the Amended Complaint the Defendant has acted arbitrarily, capriciously and in bad faith.

## OPPOSITION TO POINT VI – COMMON LAW CLAIMS

### Opposition to A - Failure to Plead the Elements of the Claim

Defendant is mistaken, Plaintiff has plead his fraud claims with the required Rule 9(b) specificity. In regards to the Defendant's contests, the fraudulent statements are detailed, including where and when they were made and by whom. Plaintiff's evidence also gives rise to a strong inference of fraudulent intent and points to conscious misbehavior, recklessness and misrepresentations of material fact. The defendant knew their misrepresentations to be false and induced reliance by the Plaintiff and others. For example, the Defendant knew ahead of time that they would be paying out $225,000, yet advertised the Challenge to pay out $300,000 in numerous promotional materials. Defendant also knew that they historically selects fewer winning spots than advertised, yet continued the misrepresentation of selecting 25 to 35 year after year. Defendant also knew they does not select "World Positive" companies, do not use third-party Judges, etc, and overall had a duty to know the Challenge is an illegal contest. Not only does Defendant not provide any disclaimers of "void where prohibited" in states where accepting fees for a skilled contest is illegal, they also do not submit into evidence any of the legally required state registrations, such as from Arizona. The veneer of Defendant's legitimacy and legality, coupled with the false advertising claims, induced contestants into applying to the contest under false pretenses.

Furthermore, Defendant's recklessness is apparent given that the Berkley Center has several lawyers on staff, NYU has a separate and large legal department and a top law school, yet did not care to use these significant legal resources at their disposal. Defendant also opted

not to spend any part of its billions to hire a contest and sweepstakes law firm, or a contest operator, to structure their contests legally.

### Opposition to B - Negligent Misrepresentation

All five conditions to state a negligent misrepresentation claim have been satisfied in the Amended Complaint. Furthermore, the special relationship element involving privity of contract is also satisfied because by entering the contest, Plaintiff was required to simultaneously enter into an agreement where NYU would hold a convertible note in Activate where the potential future prize money would convert to equity at a future maturity date or during a financing event. (Dkt. 37, P. 47, Ex 31). It is clear that Plaintiff relied on the negligent misrepresentation by paying for and putting in effort into entering the contest.

### Opposition to C - Promissory Estoppel

Plaintiff has  identified multiple clear and unambiguous promises, reasonable foreseeable reliance and injury sustained as a result of this reliance. Defendant contradicts themselves by stating, "Plaintiff has not identified any rules or guidance published by NYU regarding the contest that was considered a promise" (p. 20) when previously having admitted one of the rules was a promise, "had NYU chosen the promised number of entries." (p.17). The injuries requirement has also been met and discussed in depth in this memorandum.

### Opposition to D – Unjust Enrichment

The Defendant falsely states that Plaintiff's entry was evaluated for its merits, such as "the application lacks…financial modelling," yet the evidence proves this selection criteria, and others, prove that the entry was not evaluated on the merits. An illegal contest masquerading as lawful, fair and promising substantial prizes also creates clear reliance and inducement to participate. The $100 payment is thus for the "expectation" that the product performs as a fair and legal contest and not a guarantee of selection. Defendant pocketing these fees and selling short contestants to reduce costs is the definition of unjust enrichment.

16

The same holds true for Defendant pocketing tuition money and advertising alumni benefits that it later unilaterally withholds without valid justification, and refuses to adjudicate internally. At the contests and university application rates identified in the Amended Complaint, NYU is unjustly enriching itself at the tune of thousands of dollars in contest fees and millions in tuition for withheld university services.

### Opposition to E - Breach of Fiduciary Duty

Plaintiff respectfully refers the Court to the argument stated in Point IV on page 12 of this memorandum.

### OPPOSITION TO POINT VII - PLAINTIFF FAILS TO PLEAD A CAUSE OF ACTION DISCRIMINATION OR RELATIONATION UNDER TITLE VI

Plaintiff has demonstrated that he is a member of a protected class and qualified for the applied for programs, yet was rejected to fill open spots, even after they continued to remain available after his rejection.

Plaintiff being banned is not an allegation, as the Defendant falsely states, but an undisputed fact. Also a fact is that the Berkley Center's services were made available, and remain available, to other alumni and contestants of a different sex, color, race, religion and national origin to the Plaintiff. Defendant's MTD mysteriously states, "Plaintiff alleges that he was banned from the Berkley Center unless multiple discriminatory conditions were met, but does not describe what these alleged discriminatory conditions are." (p. 25) Both the original and Amended Complaint clearly describe the mandatory discriminatory conditions: 1) Get to know your customer (which was addressed in Plaintiff's submission); 2) Create a porotype (the website and social media accounts collecting membership, which were referred to in the submission); 3) Build a team (not mandatory per NYU's rules). Director Lafuente clearly but falsely states, "These [3 conditions] are the minimum expectations/baseline for the support we can provide." (Dkt. 37, Page 48, ¶ 92 & ¶ 55)

17

Defendant's footnote authority on page 29, *Patterson v County of Oneida,* offers no support to the MTD and in fact undermines it. The Defendants in *Patterson* provided evidence to show that Patterson had been dismissed not for any discriminatory reason, but because he had been accused of assaulting an inmate, domestic violence and other wrong doing leading to his dismissal. NYU has not provided a single valid reason for not selecting Plaintiff, for banning him from start-up advising, or for placing three bogus conditions to use the Berkley Center, effectively banning him from all services and programs.

The Defendants in *Patterson* also submitted evidence listing several African-Americans who had successfully completed the Department's probationary period and been elevated to permanent status and a list of employees who had not successfully completed the probationary period, which included individuals of both genders and all races. NYU has provided no such evidence to show anyone was banned, or had Plaintiff's conditions placed on them. The Court also noted, inter alia, that the evidence showed that all officers who had received some of the weapons training that Patterson claims was denied him "were more senior than plaintiff (in most cases significantly more senior)." NYU has submitted no similar evidence. Plaintiff's evidence in the present case demonstrates that others holding different protected characteristics were less senior, and in most cases significantly less senior, and their submissions were objectively less competitive, yet were selected or are in good standing.

For example, a previous Challenge winner who is white, won the entire contest with a tattoo company idea (with a goal that everyone would one day "rock" a temporary ink tattoo) despite this submission objectively failing the "World Positive" selection criteria. An empirical study on the National Library of Medicine website drives home this point, "Is tattooing a risk factor for adolescents' criminal behavior?...Tattooed juvenile detainees were significantly more likely to commit fraud, assault, drug abuse, and homicide by 3%, 13%, 9%, and 9%, respectively… From a policy perspective, given the significant link between

tattooing and criminal behavior, the presence of a tattoo in adolescents may serve as a valuable indicator regarding adolescents' high probability of committing crimes." (Opp. Ex. )

Incredibly, another founder with different characteristics was selected with an untested jock strap product. The founder explains to the Judges on an NYU video there was zero testing done to prove the superior performance claims, stating, "Nothing from a visual and feeling perspective, nothing in scientific metrics." Other examples are provided in the Amended Complaint and throughout this memorandum.

In regards to the claims of ongoing discrimination/retaliation, Plaintiff has entered into evidence an NYU response to a 2022-2023 Challenge prospective contestant who filled out the initial questionnaire indicating he is a one person team: "Congrats! You are eligible to apply." (Dkt. 37, Ex. 19B) Plaintiff, however, remains banned for being a one person team. NYU's rules currently on the Berkley Center website also specifically allow Plaintiff (a Stern double alumnus) to be a one person team, "FAQ: Can I enter the Challenge if I am an NYU Alumnus/a? Answer: Alumni of the NYU Stern School of Business may apply on their own." Discovery will show hundreds of one-person teams enjoying Berkley Center services.

Plaintiff has provided ample evidence in support of a prima facie case for his disparate treatment discrimination claims. Under the McDonnell Douglas Burden-Shifting framework, See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burden of production shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the multiple instances of unfair treatment. The McDonnell Douglas framework turns on circumstantial evidence and inference, having the Plaintiff demonstrate the Defendant's proffered non-discriminatory reason for non- selection or ban is "unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "The Supreme Court constructed the elements of the [McDonnell Douglas] prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination." *Diamond v. Colonial Life &*

19

*Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005) (citing *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002), aff'd, 539 U.S. 90 (2003)).

 Defendant also improperly relies on *Kajoshaj v. New York City Department of Education*, 543 F. App'x 11, 14 (2d Cir.2013). The Defendant in *Kajoshaj* was able to demonstrate that the student's grades objectively failed the exams necessary for promotion and the Plaintiff failed to provide example of others who failed but were promoted. Defendant's use of *Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) is also distinguished from this case. The Court explains, "Manolov has failed to allege any *facts* suggesting that he or other white males were treated differently than other students. Indeed, Manolov's factual allegations concern his professors' practices of "habitually start[ing] classes late," "start[ing] exams late, [etc]." Plaintiff claims of discrimination in this case however are supported with numerous relevant facts and evidence.

 The evidence of Defendant handing out alcohol as prizes (admitted as tradition by senior administrators) is an example of that discrimination because, while it is a reward to some, it is objectionable to others along racial, religious, national origin and cultural lines. (Dkt. 37. Ex. 25-26) Moreover, is completely unnecessary, inappropriate, against NYU rules and the law to hand out alcohol at a university event without checking age. Even after this practice was flagged, Defendant still does not understand "how" or "why" it is problematic. Inexplicably, when residential assistants at NYU recently attended a party where alcohol and undergraduate students were present, NYU claimed breach of contract due to the assistants not abiding by the terms of the student handbook and fired the assistants. But when NYU administrators serve alcohol to students on video, and use this video in promotional materials to sell future editions of their contests, this is swept under the carpet and no administrator is held accountable.

20

In regards to retaliation, more than a year later, Plaintiff remains barred from booking start-up advising and the discriminatory conditions preventing his use of the Berkley Center have not been lifted. The Defendant has taken some remedial actions such as, discontinuing the Hackathon contest, revising the prize money and removing entry fees for 2022-2023 Challenge student applicants (undoubtedly in response to this lawsuit) and making them "voluntary" for others, yet continues to ostracize Plaintiff. Plaintiff even brought the discrimination, and other contest illegality, to the attention of senior NYU administrators, such as President Andrew Hamilton when he met him in London, England on May 25th, 2022 (Dkt 37. Ex. 65) and attempted to report it to NYU using the online discrimination complaints form, which turned out to be dysfunctional. (Dkt. 37. Ex. 64)

## OPPOSITION TO POINT VIII – THE CIVIL RIGHTS RESTORATION ACT OF 1987/THE GROVE CITY BILL/TITLE IX

Defendant is mistaken, only the Challenge final prize money is funded by alumni. The operation of the competition and all NYU entrepreneurship programs and services are funded with federal money. Under Title IX, these services are considered educational programs and cannot discriminate on the basis of gender. The US Department of Justice Title IX Legal Manual states, "A recipient generally may not provide an education program or activity separately on the basis of sex or require or refuse participation by an individual of a certain sex in courses such as... business...on the basis of sex." (65 Fed. Reg. 52871).

The manual further states, "To establish disparate treatment, the fundamental task is to show that similarly situated individuals were treated differently because of, or on the basis of their sex. This requires that the decision maker was aware of the complainant's sex and took action at least in part based on that sex. This does not mean, however, that the evidence must show "bad faith, ill will or any evil motive on the part of the [recipient]. Disparate treatment prohibits unjustified sex-based distinctions regardless of the motivation behind those distinctions. For example, many statutory or administrative schemes that illegally

21

discriminate on the basis of sex were created or were subsequently justified as efforts to address the special needs of a particular sex. It is not a harmful motive, but the decision to treat differently on the basis of sex, that runs afoul of Title IX. Evidence of discriminatory intent may be direct or circumstantial and may be found from various sources, including statements by decision makers, the historical background of the events in issue, the sequence of events leading to the decision in issue, a departure from standard procedure (e.g., failure to consider factors normally considered), legislative or administrative history (e.g., minutes of meetings), a past history of discriminatory or segregated conduct, and statistical evidence."

Plaintiff has made specific reference to Defendant's programs showing preferential treatment to female entrepreneurs and contestants from 2021 to present, such as Erica Toggle (Dkt. 37 Pg. 27, ¶ 38) Sarah Anderson (Pg. 39, ¶ 72) and Anastasia Vlasova (Pg. 49, ¶ 100). Erica was selected with a start-up to create the Uber of free-lance cooks (with no benefits during a pandemic) who also have to shop and clean for affluent families. Sarah was selected with a scientifically untested, non-FDA approved medical-device promising miraculous results that was being sold to the public illegally despite the Challenge eligibility agreement stating, "Concepts that promote or enable any illegal activities will not be considered for entry." (Dkt. 37. Ex 44-45) Anastasia's start-up was admirable, but she was a teenage freshman who was uncompetitive in other selection criteria. All three females were one person teams. Another female Challenge finalist from a previous edition, Paige Anderson, was selected an "NYU Founder of the Month" in 2022 as a one person team (64% of the Founders of the Month in 2022 were female). Prospective female contestants Lanesha Williams and Yasmin Yusuf were also told they do not need to have teammates. The Berkley Center writes to Yasmin, "not if you don't want to…it is not mandatory" and Assistant Director Fuentes writes to Lanesha, "there is no minimum [for a team]." (Opp. Ex. 7)

22

This type of gender discrimination at NYU is not isolated, but pervasive. NYU has female only entrepreneurship programs, notably the "Female Founders Circle," the "Female Founder Forum" and a "Female Founder Fellowship" (also open to alumni). These programs state they are open to every gender, but the name is discriminatory and nearly all program marketing such as, "Join us for an inspirational half-day event focused on opportunity and community building for female founders!" The main website for the Fellowship states, "The Female Founders Fellowship at NYU: Empowering women entrepreneurs to bring their ventures to life." Another section states, "Thanks to the team at the NYU Entrepreneurial Institute, women entrepreneurs at NYU can access an array of resources and support through the Female Founders Fellowship." An NYU article on the Entrepreneurship website also states in the title, "TALEA and Female Founders Forum: Making Space for Women." Another NYU website states, The Fellowship upholds one primary goal: to cultivate an empowering and inclusive environment for women entrepreneurs.

The "array of resources and support" of the above programs are too many to list, but include the "exclusive" opportunity to apply for up to $50k in grants after graduation. They also offer preferential treatment across other programs: Females are guaranteed an automatic interview for the Venture Equity Program, Tech Venture Accelerator, "highly competitive" NYU Summer Launchpad Accelerator and Start-up Sprint program. Females also have priority office hours with the NYU Entrepreneurial Institute Coaching Team and Founders in Residence, invite-only office hours with external mentors, invite-only monthly peer group events with other members of the Female Founders Fellowship.

In regards to the "highly competitive" Startup Accelerator program, the NYU Female Founder Community website states, "Here are a few statistics we're particularly proud of: 68% of the teams who participated in our Startup Accelerator Series last year are led/co-led by Female Founders." A review of the gender ratio of the more recent J-Term Sprint

23

Accelerator 2023 program/competition reveals it is also more than 60% female. For the 2021-2022 Hackathon contest, females made up 71% of the selections and 100% of the final winners.

The most overt discrimination is the Fellows program, which states, "We seek to build a diverse, inclusive cohort of fellows…regardless of sex," yet 100% of the 12 initial program Fellows were female and 100% of the current Fellows, 22 of 22, are female - several of them 2021-2022 Hackathon and Challenge winners. Moreover, the Female Fellows is even designed to discriminate against ventures that may be a mix-gender team. The program specifically targets individual entrepreneurs, as stated in the online application, "The Female Founders Fellowship is for individual humans. This is not a team application." Females are therefore discouraged from having male team members if they wish to participate in the program with their team members. The proof is in the pudding with not a single male "Female Fellow" who is in the program as a co-founder or even as a team member of a venture with a female "Female Fellow."

The Title IX violations in these programs and resulting gender inequality at NYU is more pronounced when viewed in a wider context. A 2021 NYU article states, "The [Female] Fellowship provides community, as well as extensive training, mentorship, and networking opportunities to student entrepreneurs at NYU who are committed to advancing gender equity in entrepreneurship," yet a few sentences later admits that, "Largely due to this and similar initiatives, over 60% of the ventures we now support [at NYU] are led by a woman founder," which is nearly double the ratio of female representation for NYU business students, 35% (available data from 2016).

Further proof of pervasive gender discrimination at NYU can be gleaned from The Female Founders Community website. The website boasts, "NYU ranks #1 Globally as the university with the highest % [25%] of funded companies led by a female founder [93 of 379

24

total NYU funded ventures].” These statistics are obtained from a 2018 study in a Forbes

article linked to the website. As a proxy, 75% of ventures worthy of funding at NYU are male

according to the study, yet 60% of the ventures supported by NYU’s programs are female.

NYU is going overboard in attempting to level equality of outcome with equality of

opportunity. Not surprisingly, 66% of the Berkley Center for Entrepreneurship team is

female, 77% of the NYU Entrepreneurial Institute team is female and both of NYU’s Title IX

Coordinators are female.

Rebecca Silver, Associate Director of NYU’s Entrepreneurial Institute, openly

substantiates the Title IX allegations, “When we looked at our programs, we noticed, by far,

more men than women were applying and participating. Moreover, the entrepreneurship

space is wildly disparate in terms of the share of capital that goes to women-led ventures

versus those led by men. Because of this funding gap, it’s harder for women to work on their

ventures full time after they graduate. That’s why we launched the Female Founders

Fellowship. We wanted to offer women educational resources and a supportive network. As

well as the opportunity to apply for up to $50,000 in funding to put toward their student

loans.”

This sort of thinking to support female entrepreneurship at any cost is not only

discriminatory, but dangerous. Elizabeth Holmes, a former 19 year old female entrepreneur at

Stanford and founder of now discredited “Theranos,” was not scrutinized as required because

of her gender despite operating in the medical field. Without any published peer-reviewed

research, she was awarded the 2015 Bioscience Company of the Year by the Arizona

BioIndustry Association, raised $700M from investors and allowed to jeopardize public

safety with her scam product installed at 40 Walgreen locations. Those who raised alarm

bells were ignored because the popular opinion was to give this visionary young  Female

entrepreneur the benefit of the doubt. This story shares many parallels with NYU selecting

and promoting Sarah Anderson and her scientifically untested, non-FDA approved medical device business claiming miraculous results. Sarah and her venture even won the Audience Choice Award on the final day of the Challenge after Plaintiff's FDA approval concerns raised to the Judges were dismissed when Sarah simply answered that as an expert in the field she knows it is not required. (The FDA has since responded that the venture is problematic).

While it is important to support female entrepreneurs, NYU does not have to do it by discriminating against men or supporting unqualified or illegal female businesses. NYU has the funds to create a larger pie from which to benefit both genders, rather than cutting the same pie (while reducing the size of the pie) into discriminatory slices. NYU however, has chosen breaking the law as policy to virtue signal promoting female empowerment and chase headlines as a progressive university. The Forbes article states, "New York University emerges as the school with potentially the most female-friendly culture."

What can be further surmised from the Forbes article is the level of discrimination of NYU's policies relative to its peers. NYU's female venture funding percentage is a statistical outlier; the next top nine universities collectively average 12%, less than half of NYU (Yale 16%, Stanford 14%, Cornell 13%, Harvard 13%,  UPenn 13%, U of Texas 12%, U of Michigan 11%, UC Berkley 10%, MIT 9%). These disparities make sense when viewed through the lens of NYU Title IX discrimination in entrepreneurship programs, but not at other schools.

Financing from the market can be viewed an objective selection process that does not choose based on gender, but on merit and supply of investable ventures, which as stated averages 12% for female ventures at the next top 9 schools. NYU on the other hand (aside from selecting 60% female winners) states online, "To add to these accomplishments, 52% of the investments made by our Innovation Venture Fund supported ventures led by women founders." Even assuming the Forbes figure of 25% is not being inflated with NYU

26

investment in its female ventures, the disparity between 12% and 52% leads to the conclusion that considerable gender discrimination is taking place within NYU's entrepreneurial programs, all under the guise of incusion, diversity, meritocracy and legality. (Opp. Ex. 8)

Given the above facts, NYU is in clear violation of Title IX by discriminating by sex in its entrepreneurship programs. If the university was genuinely committed to helping women, and not just virtue signalling, it would not have sabotaged Plaintiff's efforts to combat toxic social media culture, a leading cause of young women's mental health issues, such as low-self-esteem, anxiety, depression and suicide. (Dkt. 37, Ex. 69, Apx. 2) Instead, NYU chose to routinely prioritize reducing costs (by selecting fewer winners, etc) while their predominately male leadership pay themselves multiple million dollar salaries and perks.

### POINT IX – DISCRIMINATION OR RETALIATION UNDER THE ADA

No objection, Plaintiff realizes that needed to have exhausted remedies pursuant to the Act.

### POINT X – NYSHRL & NYCHRL CLAIMS

No objection, Plaintiff realizes these laws relate to employees or covered non-employees.

### OPPOSITION TO POINT XI - FALSE ADVERTISING TO THE PUBLIC/  GBL

The Defendant admits in the MTD that, "The [Challenge] competition was publicly declared." (Pg. 20) Furthermore, available statistics from 2016 show that 501 contestants applied and 27% of the Challenge quarterfinalists were non-NYU contestants. Extrapolating, about 135 individuals were from the general public.

Defendant also improperly cites *Costigan v. CitiMortgage, Inc.* which is distinguished in numerous ways. Costigan's only contract was his mortgage with CitiMortgage, and he was not part of the Service Participation Agreement with Fannie Mae. His contract also contained a clause that Citi could "foreclose by judicial proceeding." Plaintiff in this case had multiple contracts directly with NYU, and there were no such clauses or disclaimers permitting their actions to deny Plaintiff alumni services, or alter the terms of the contests.

In regards to the Defendant's belief that their acts do not impact consumers at large, "The New York Court of Appeals has stated that a standard marketing scheme directed at consumers at large or a multi-media dissemination of information tends to show an impact on consumers at large (*Gaidon v Guardian Life Ins. Co. of Am*., 94 NY2d 330, 339, 344 [1999] ; *Karlin v IVF Am., Inc*., 93 NY2d 282, 289, 293 [1999]). NYU disseminated their contests using multi-media (PowerPoint, Youtube, Zoom, Emails, Website, etc) and employed marketing tactics to inform the public about their contests. In 2021, The Court of Appeals also confirmed the expansive reach of what constitutes "consumer-oriented" conduct, making clear that it extends beyond products and services directed to individuals for personal or home use, and includes sales and marketing directed to businesses and professionals.

The evidence provided by Plaintiff shows from NYU's rules that the contest is open to all members of the public who can associate themselves with at least one NYU-related team member. Furthermore, the payments made to NYU are not per team, but paid individually by each team member. NYU even has a specific price band for the consumer public not related to NYU. Plaintiff provides evidence that NYU even allows minors in high school to be paid contestants, consequently greatly increasing the public reach of the services and adding a level of heightened level of responsibility and accountability to protect the welfare of minors such as namely not deceiving them or potentially handing them alcohol as prizes.

In the current matter, Defendant's acts were also not unique to its relationship with Plaintiff. The marketing and sale of NYU products with specific alumni benefit terms, and contests, were not limited to a single transaction, and were sold to a robust consumer base. Furthermore, according to the statute, a GBL § 349 claim does not "depend on the use to be made of the product, and "what matters is whether the defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace." The Courts have also stated that the marketing need not be directed to all members of the public for a claim to be valid.

In regards to the injury requirement, the Courts have explained that "[t]he underlying legislative purpose behind GBL § 349, as well as common sense, require the conclusion that when a consumer would not have purchased a product but for the defendant's deceptive conduct, that consumer has suffered a cognizable injury, i.e., the price that the consumer paid for the product." In this instance, had Plaintiff known that NYU was promoting its products deceptively, Plaintiff would have attended a different university and not paid or applied to its contests. In regards to all of NYU's products, The Code of Ethical Conduct online is purely intended for marketing purposes to placate consumer fears arising from their decision to make life changing monetary and time investments. NYU states, "The purpose of the New York University Code of Ethical Conduct is to highlight the essential elements of an ethical and responsible environment in which the central educational goals of the University can be met effectively and efficiently," but that is hardly the case as proven by the evidence. While these statements and others may appear as broad policy statements, they in fact contains specific binding promises for how the purchasing consumer public will be treated.

In regards to GBL § 350, The New York Court of Appeals in *Karlin v. IVF America, Inc*. stated that the law on its face, "applies to virtually all economic activity." Furthermore, New York law is liberal in its pleading requirements under CPLR § 3013. Prevailing private Plaintiffs are also entitled to damages and injunctive relief in successful cases. The Court, at its discretion, may also award reasonable attorneys' fees with treble damages (three times actual or compensatory damages). Furthermore, the Courts have applied that the standard to determine whether an advertisement is misleading is not whether it is deceptive to the hypothetical reasonable person, but to "the ignorant, the unthinking and the credulous," who, in making purchases, do not stop to analyse but are governed by appearances and general impressions. See *De Santis v. Sears, Roebuck and Co., 148* A.D.2d 36, 38, 543 N.Y.S.2d 228, 229 (3d Dep't 1989).

29

GBL § 349, Section 350 also does not require "justifiable reliance" according to the New York Court of Appeals in *Koch v. Acker, Merrall & Condit Co*., which made class actions more accessible. The Courts have since held that merely, "seeing the misleading statements before coming into possession of the products," was sufficient to establish causal connection. The Courts have also held that the pleading-with-particularity requirement of CPLR 3016(b) normally required for claims sounding in fraud does not apply to GBL §§ 349 and 350 causes of action.  Claims under GBL §§ 349 & 350 are also "not subject to the pleading-with-particularity requirements of Rule 9(b)." *Pelman ex rel. Pelman v. McDonald's Corp*., 396 F.3d 508, 511 (2d Cir. 2005). They "need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman*, 396 F.3d at 511.

Defendant's deception also need not be an affirmative act, but can also be accomplished through omission. For example, in *Miller v. Kaminer*, 88 N.Y.S.3d 792 (N.Y. Civ. Ct. 2018), the Plaintiff sought a refund for a deposit and prepayment of child care services paid to the Defendant, who knew at the time of payment that the owner of the business was terminally ill. The Court found that "[t]he failure to inform claimant at the time his child was placed in child care that his deposit and pre- payment would not be reimbursed because of the imminent dire health circumstances is an omission which constitutes a deceptive act. Similarly, NYU knew ahead of time that it would not be awarding $100,000 per final three winners, it would not be using third-party judges, it would not be selecting based on the stated "World Positive" company criteria, it would not select a minimum of 25 advertised winners for the Challenge, amongst other omissions. Incredibly, even after the filing of this complaint, the Defendant continues to deceive the public with the promise of 25 to 35 chosen winners, amongst other fraudulent advertising.

NYU refers to *Manchanda v. Navient Student Loans & Educ. Credit Mgt. Corp*. but this case is distinguished from the facts before this Court. Manchanda's fraud claims fell short

30

of satisfying Rule 9(b) because the complaint repeatedly alleged that Defendants "misrepresented" or "lied" about the servicing and collection of his student loan debt, but the complaint was silent as to the "who, what, when, where and how." Manchanda's GBL § 349 claim also rested on his allegation that Navient "erroneously" stated his balance as $309,000, which similarly failed because Manchanda conceded that Navient corrected the balance upon discovering its error. NYU on the other hand has not corrected any of its "errors" or misleading advertisements, even after being made aware of the "errors."

Plaintiff is able to meet the requirements of Federal Rule of Civil Procedure Rule 9(b) which provides that "the circumstances constituting fraud . . . shall be stated with particularity." To satisfy the particularity requirement, "the complaint must: "(1) Specify the statements – the evidence shows that NYU fraudulently stated $300,000 total prize money for the Challenge contest, 25 minimum winners, third party judges, only "World Positive" start-ups would be selected, etc. (2) Identify the speaker – the evidence shows that the NYU President and NYU Berkley Center Directors are amongst the speakers as well as NYU as an entity, (3) State where and when the statements were made – the evidence shows these statements were made on NYU's websites, emails, in PowerPoint presentations and in promotional videos and elsewhere and the times they were made and, (4) Explain why the statements were fraudulent – Defendant stood to benefit from reducing the number of winners, reducing the prize money, using internal Judges with conflicts of interest, etc.

Plaintiff's evidence also gives rise to a strong inference of intent, which may be achieved by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. The facts stated in this memorandum, as well as those in the Amended Complaint, show a high level of conscious misbehavior  and recklessness in administering NYU's start-up contests, and in the operation of Berkley Center programs.

Defendant's reliance on *Bezuszka v. L.A. Models* is also distinguished from the facts before this Court because in part the fraud was not pled with particularity, such as not identifying the speakers or the date of the misrepresentations. The Court also states that the complaint never alleges that the Model plaintiffs are "consumers," and further states that models are not "the general public." Plaintiff in the present case has alleged, and proven with evidence, that thousands of contestants from the NYU community and the greater public were consumers of the products in question.

Furthermore, "While it is possible for a Court to decide this question as a matter of law," D*e Fink v. Time Warner Cable* , 714 F.3d 739, 741 (2d Cir. 2013), "this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage," See *Buonasera v. Honest Co.* , 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016) (whether labels on hair care products were misleading under GBL §§ 349 – 50 was question of fact to be resolved by jury); see also, e.g., *Eidelman v. Sun Prods. Co.* , No. 16 Civ. 3914 (NSR), 2017 WL 4277187, at *3 (S.D.N.Y. Sept. 25, 2017) (collecting cases); *Kacocha v. Nestle Purina Petcare Co*. , No. 15 Civ. 5489 (KMK), 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) (same). Further stating, "Even setting aside the puffery analysis, the Court cannot determine as a matter of law that no reasonable consumer could be misled to believe that the Product caused no flakes. As noted, dismissal on a Rule 12(b)(6) motion is often not appropriate where doing so would require assessing how a reasonable consumer would respond to particular representations." See, e.g. , *Eidelman* , 2017 WL 4277187, at *4."

In regards to alleging injury, Defendant in *Duran* argued (similar to Defendant in this case) that FAC failed to allege injury, the final element needed for GBL §§ 349 and 350 claims. In response, Duran contends that the FAC has adequately pled a price premium theory of injury. The Court agreed with Duran, "The Court therefore finds that the FAC has alleged sufficiently injury and declines to dismiss the GBL §§ 349 and 350 claims for failure to state a

claim." This is reaffirmed, "A plaintiff can show this injury by alleging "an overpayment, or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice." *Izquierdo* , 2016 WL 6459832, at *7 ; see also *Orlander* , 802 F.3d at 302 (acknowledging price premium theory in consumable goods cases, where plaintiffs alleged they paid more for goods than they would have but for defendants' deceptive practices).

To allege injury under a price premium theory, a plaintiff must allege not only that defendants charged a price premium, but also that there is a "connection between the misrepresentation and any harm from, or failure of, the product." *DaCorta v. AM Retail Grp.* , No. 16 Civ. 1748 (NSR), 2018 WL 557909, at *7 (S.D.N.Y. Jan. 23, 2018) (quoting *Small v. Lorillard Tobacco Co.* , 94 N.Y.2d 43, 56, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999). Plaintiff  in the present case paid a premium and later learned that the products did not, in fact, have the marketed qualities. Plaintiff can cite off the top of his head several business plan competitions and incubator programs that are free to enter, such as the Halcyon Incubator: "The Halcyon Incubator is committed to solving 21st- century challenges throughout the nation and the world. During the Halcyon Residential Fellowship, a diverse cohort of fellows receives free residency and workspace, mentorship and leadership coaching, robust support from business consultants, and a living stipend to develop their entrepreneurial vision."

NYU's $100 Challenge fee, is the largest known start-up competition entry fee and is even greater than the $80 fee to apply to NYU, and most certainly supports a price premium theory of injury. Plaintiff contends that if you conduct a survey about NYU contest advertising, Stern's "Radically Responsible" claims or NYU's customer facing Code of Ethics with prospective customers, and ask them if these claims move to them to pay a premium for NYU services over competitors, the majority would answer yes. The same holds

for NYU's degree products, some of the most expensive in the world, which are justified by offering alumni benefits, but which apparently NYU feels can be withheld unilaterally.

The Courts have also indicated that the injury need not be monetary, such as in *Guzman v. Mel S. Harris and Associates, LLC*, where the Court acknowledged that "[e]motional harm … satisfies the injury requirement for a claim under … GBL § 349," and found the plaintiff's "emotional injuries" were sufficient to withstand a summary judgment motion where he claimed to be "stressed and frustrated … and experienced difficulty sleeping and concentrating." Plaintiff in the present case has experienced these injuries.

## OPPOSITION TO POINT XII - PLAINTIFF CANNOT SUBSTANTIATE NYU COMMITTED FALSE ADVERTISING TO THE PUBLIC AT LARGE

As previously stated, the Defendant admits in the MTD that, "The competition was publicly declared." (Pg. 20) Furthermore, Plaintiff presents evidence of all the elements required by the Lanham Act, "To state a claim for false advertising, a plaintiff must allege "(1) a false or misleading statement (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff." *Sussman-Automatic Corp. v. Spa World Corp*., 15 F. Supp. 3d 258, 269 (E.D.N.Y. 2014). A plaintiff may establish that a statement is false by demonstrating that challenged advertisement is "literally false, i.e., false on its face," *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir. 2007). All of the above are alleged by Plaintiff with factual supporting evidence. The Challenge literally does not select 25 to 35 winners or pay out $300,000 in total prize money as advertised, and no one would consider these statements generalized or exaggerations, making Defendant's authority *N. Am. Olive Oil Ass'n v. D'Avolio Inc.,* 457 F. Supp. 3d 207 (E.D.N.Y. 2020) distinguished from this case.

In addition to proving falsity, a Plaintiff must also show that the statement were material such that it misrepresented an "inherent quality or characteristic of the product." *S.C.*

*Johnson & Son*, 241 F.3d at 238. Skilled contests which pay out arbitrary amounts, select based on arbitrary metrics, select an arbitrary number of winners, etc, all misrepresent the inherent quality of the contest (rendering it an illegal lottery) and influence the purchasing decision. Furthermore, Plaintiff has suffered a commercial injury ($100 lost, wasted time to launch his venture, lost membership, sales, etc) that is directly and materially correlated with NYU's false advertising and deceptive business practices. Furthermore, under the law of the Second Circuit, even where a Plaintiff has not demonstrated injury, the equitable disgorgement of a defendant's profits may be ordered in the interests of deterrence if the plaintiff can show that Defendant wilfully violated the Lanham Act. See *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992). The Courts have also held that plaintiffs do not have to prove actual injury.

Defendant also falsely states, "There is nothing to indicate that even if he were chosen to partake in the competition, he would have won the monetary prizes." (p. 32) This statement is further proof that the Defendant's attorneys are not knowledgeable of the facts or circumstances despite their sworn statements claiming the affirmative. It also demonstrates they have not performed the required reasonable inquiries in formulating their defense. The facts are, as demonstrated by Plaintiff's evidence, that simply partaking in in the Hackathon or Challenge provides substantial rewards, such as prototyping grants, services from corporate sponsors, professional one-on-one coaching, legal services, publicity and validation etc, irrespective of who wins the monetary prizes awarded on the final day. Defendant's website in fact states that the benefits of being in the Challenge are "valued at tens of thousands of dollars" and "Each winning team is also connected with pro bono services provided by our partners, valued at over $30,000."

In regards to fraud allegations, the Courts have written that, "Although Rule 9(b) contains a heightened particularity standard, it also relaxes the standard for pleading

35

fraudulent intent: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Such a "strong inference" can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). To determine if the "strong inference" requirement is met, a Court should "consider the complaint in its entirety and take into account plausible opposing inferences." *Loreley Fin.* (Jersey) No. 3 Ltd. v. *Wells Fargo Secs., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks and citation omitted). If the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," then it is sufficiently strong. Id. (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). As stated earlier in the motion recklessness can give rise to fraudulent intent.

Plaintiff's Amended Complaint and the evidence in support make a cogent argument that is as compelling as any opposing inference. The Berkley Center knows that its contests are fraudulently misrepresentations of the truth, and with a large legal department, NYU must know that its contests don't conform to Federal guidelines and are thus illegal. NYU, however, does not care as it believes its academic immunity puts it above recrimination and that few will dare stand up to it internally, let alone in a court of law. NYU is acting with known malice towards its community and the general public in the form of actively maintaining power in its contests to manipulate the results to meet narrowly defined investment and other goals, such as to virtue signal with less competitive female winners, lower costs, placate larger business and other special interests, etc.

## OPPOSITION TO POINTS XIV – INJUNCTIVE RELIEF

Defendant falsely states that Plaintiff's allegations are of past exposure, when in fact they are of past, present and future exposure to NYU's illegal conduct. The authorities cited by the Defendant in Point XIV in fact support Plaintiff's case. In *Chiste v. Hotels.com L.P* the Court states, "[W]here there is a bona fide dispute regarding the existence of a contract, plaintiffs may plead a breach of contract claim and an unjust enrichment in the alternative." *Duran v Henkel of Am, Inc.,* also supports Plaintiff's case in regards to non-dismissal of the allegations that the marketing of NYU's contests are materially misleading. The Court states, "In assessing whether an act is materially misleading, the inquiry is whether, objectively, the act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co*. , 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank* , 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)).

## OPPOSITION TO POINT XV – DIVERSITY & JURISTICTION

Defendant submits a frivolous argument and irrelevant authorities. Defendant enters into evidence a summons dated August 2022, yet this present case commenced in May 2022. *Bates v. Offit Kurman Attorneys at Law LLP*, 19 Civ. 2814 (KPF) (S.D.N.Y. Dec. 20, 2019) states that, "a party's citizenship is determined at the time when the suit was initiated. *Mansfield,* 111 U.S. 379. Furthermore, in *Grupo Dataflux v. Atlas Glob. Grp., L.P*., 541 U.S. 567 (2004) the Court states, "This Court has long adhered to the rule that subject-matter jurisdiction in diversity cases depends on the state of facts that existed at the time of filing. This Court has never approved a deviation from the longstanding rule that "[w]here there is no change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Conolly v. Taylor*, 2 Pet. 556, 565.

The summons submitted is even more irrelevant as Civil Court rules allow a Plaintiff to start an action as a non-resident in New York if the Defendant operates in New York, as is

the case. Had NYU put in the reasonable inquiries under the circumstances, they would have known this, rather than relying on the frivolous and sabotaging allegations and submissions of non-party to this claim, Attorney Sibanda, who copied in NYU in no less than 17 emails without NYU recusing themselves (until recently, after his allegations were discredited).

### OPPOSITION TO POINT XVI – PUTATIVE CLASS ACTION DISMISSAL

Plaintiff fulfills all four pre-requisites of Rule 23 of Federal Civil Procedure, allowing him to represent several subclasses of students, alumni and contestants who were denied promised services or who applied to the illegal contests. Furthermore, in *Duran v Henkel of Am, Inc*., the Court denied the Defendant's motion to strike the putative class claims and stated, "In this Circuit, ...'[m]otions to strike are generally looked upon with disfavor.' " *Kassman v. KPMG LLP*., 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013) (quoting *Chen-Oster v. Goldman, Sachs & Co*., 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ). Motions to strike class claims are particularly disfavored because they "require[ ] a reviewing Court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." Id. (quoting *Chen- Oster,* 877 F. Supp. 2d at 117 ). District Courts in this Circuit therefore generally defer such questions to the class certification stage, when the Court has a fuller factual record. See  *Winfield v. Citibank, N.A*. , 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012)."  Furthermore, in a similar dispute where a university did not honor a specific term in the student-university contract, the Court certified three subclasses who were all impacted by the breach. *Kashmiri v. Regents of University of California,* 156 Cal.App.4th 809 (Cal. Ct. App. 2007).

### OPPOSITION TO POINT XVII - NONRELEVANT ALLEGATIONS

Defendant wrongly states, "Plaintiff admits he does not lack standing for any of his allegation in this section."(p.35) Plaintiff stated, "While Annabi may not have standing to

enforce the below allegations and <u>may not</u> have a private right of action (Dkt. 37, Pg. 7-9),

Plaintiff makes no admission that <u>he does not</u> have standing. Furthermore, these allegations

are not abusive, improper, inflammatory, nor highly inappropriate, and in fact all are highly

relevant and factually supported. For example, there is indisputable evidence that NYU

awards alcohol as prizes to students participating in the Challenge contest, contrary to

University policies and this allegation is relevant to NYU contest discriminatory practices.

Furthermore, Courts have allowed Plaintiffs lacking standing to bring claims when it serves

the public interest, as is the case here. See *Haskell v. Time, Inc.*, 965 F. Supp. 1398 (E.D. Cal.

1997), "A private plaintiff may bring an action under §§ 17200 and 17204 to redress any

unlawful business practice, including an unlawful practice that does not otherwise permit a

private right of action, such as a criminal statute." Plaintiff's claims are therefore justified by

existing law and creating the same precedent in New York would serve the public interest.

## OPPOSITION TO POINT XVIII

Plaintiff's submissions objectively do not violate Rule 11 and all authorities here are

distinguished. Submitting a full page requesting the Court to impose sanctions in a MTD is in

itself a frivolous submission in violation of Rule 11 and retaliation for bringing these claims.

## CONCLUSION

Defendant has demonstrated that they have not performed the necessary reasonable

inquiries for their defense despite being afforded multiple deadline extension, and in bad faith

maliciously embellish on hearsay emails from unsworn witnesses to fabricate key facts.

Defendant refuses to admit any mistakes in administering or marketing their services, which

is proof that they plan on continuing the fraudulent activities, as demonstrated in the

continued 25 to 35 winner promise in the 2022-2023 edition of the Challenge. (Opp. Ex. 10)

Plaintiff has proven that NYU aggressively markets its very expensive products with

specific promises to minors and the public at large. Most of NYU's victims are young,

significantly in debt and understandably reticent in coming forward out of fear of appearing litigious in public records and hurting their future career prospects, which is vitally important to getting out of NYU related debt. The promises and contracts arising from these sales should therefore be held to stringent applications of the law.

The Court is also asked to take into consideration the context in which this dispute arose, a crippling health pandemic, a financial crisis and political, social and racial violence in America. All the claims in this dispute arose from Defendant ostracizing Plaintiff and his venture, promoting corporate wealth redistribution and an empowering social network for young people. Plaintiff's work, however, stood to be too positively disruptive to be led by a candidate with his particular protected characteristics, leading to multiple discriminatory exclusions from already illegally operated NYU programs and contests.

If the City of New York, with a multi-billion dollar budget deficit, is spending tax payer money to operate its skilled contests legally (Opp. Ex 11), the Defendant, a private entity with a multi-billion dollar surplus who primarily targets minors and students, should be held to the same standard. With the Defendant remaining intransigent, a lack of justice in this case risks further injuries to Plaintiff, the putative classes and *Karim Annabi v. New York University* becoming a legal precedent for university and contest fraud and discrimination.


Respectfully submitted,

S/Karim Annabi

Prose Plaintiff
Dated: February 23, 2023

35 Priory Crescent
Southend on Sea, UK
SS 2 6JY
Tel: +44 7508918352