UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
:
KARIM ANNABI,                                                       :
:
                              Plaintiff,                            :
:
                                                                   :        22-cv-3795 (LJL)
             -v-                                                    :
:                   OPINION AND ORDER
NEW YORK UNIVERSITY,                                                :
:
                              Defendant.                            :
:
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/20/2024

LEWIS J. LIMAN, United States District Judge:

Defendant New York University ("Defendant" or "NYU") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff Karim Annabi's ("Plaintiff") second amended complaint, Dkt. No. 70, ("Second Amended Complaint" or "SAC").  Dkt. No. 74.  Plaintiff, proceeding pro se, brings claims for breach of contract and breach of the covenant of good faith and fair dealing as well as violations of the following statutes and rights:  (1) Title VI of the Civil Rights Act and various subparts ("Title VI"); (2) New York State Human Rights Law ("NYSHRL") § 296 and various subsections; (3) New York Civil Rights Law ("NYCRL") § 40-c; (4) New York City Human Rights Law ("NYCHRL") §§ 8-107(4) and (17); (5) 42 U.S.C. § 1981; (6) Title IX of the Education Amendments Act of 1972 ("Title IX"); (7) New York General Business Law ("GBL") § 349 (the "Deceptive Practices Act"); (8) GBL § 350 (the "False Advertising Act"); (9) the Communications Act of 1934; and (10) his First Amendment free speech and religious liberty rights.  *See generally* SAC.  Defendant argues that Plaintiff's allegations fail to state a claim for relief and requests legal fees.  Dkt. No. 75.

For the following reasons, the Court grants Defendant's motion to dismiss and dismisses the Second Amended Complaint with prejudice.

## BACKGROUND

The following facts are taken from the Second Amended Complaint.  The facts pertaining to the First Amended Complaint, Dkt. No. 35, are set forth in the Court's Opinion and Order dated September 29, 2023, Dkt. No. 63 at 2–5, and will be referenced as necessary.

Plaintiff "is an American, British, and Algerian citizen, and a Canadian Permanent Resident who was born in Algeria and identifies as a progressive Muslim male of Arabic race." SAC ¶ 14.  Plaintiff is an NYU graduate; he received a Bachelor of Science degree in 2003 and a Master of Business Administration degree in 2010.  Id. ¶ 16.  Over the course of his time at NYU, Plaintiff paid the school several hundred thousand dollars in tuition fees.  Id. ¶ 17.

In 2020, Plaintiff founded "Activate," a "social benefit network" that offers "traditional and new social networking tools along with branded merchandise" and allocates 99% of its profits to ninety-nine organizations.  Id. ¶¶ 31–33.  The recipient organizations range from firefighter unions to children's charities such as UNICEF to the Red Cross/Crescent to the Equal Justice Initiative. Id. ¶ 33.  According to Plaintiff, "Activate seeks to align moral and financial incentives in society, to redefine entrepreneurship success through more inclusive profit sharing and to change business culture to be more altruistic generally."  Id. ¶ 35.  Plaintiff further alleges that Activate's "first adoption test case of its business model was successful" and that in a small, closed experiment, his venture had "quick exponential and international growth in . . . membership . . . that demonstrated traction."  Id. ¶ 36.

NYU operates two different competitions for new business ventures: the Designership Hackathon Contest ("Hackathon") and its flagship Entrepreneurs Challenge ("Challenge").  Id. ¶¶ 82, 117.  The Hackathon allows "NYU founders to collaborate with SVA designers in an exciting and intense 3-day event culminating in a usable prototype."  Id. ¶ 117.  According to Plaintiff, the Hackathon rules state that "[a]pps, web platforms, other digital products, [and]

businesses with heavy reliance on a digital component" that are "world positive" were eligible for selection. *Id.*

On September 30, 2021, Plaintiff submitted Activate to the Hackathon. *Id.* ¶ 118. Activate "met all eligibility and selection criteria, but was not selected." *Id.* A White woman and a Black woman, both entered as solo founders, were selected even though they allegedly did not meet the selection criteria. *Id.* ¶¶ 119–120.

The Challenge is a contest that dates back to 1998 and "is administered annually by The Berkley Center for Entrepreneurship" at NYU's Stern School of Business ("Stern"). *Id.* ¶ 80. Over the past ten years, the Challenge has grown to feature on average more than 150 ventures and 500 contestants each year. Dkt. No. 35 ¶ 26. "'[T]he Entrepreneurs Challenge Startup Accelerator and Venture Competition provides a springboard for NYU's most promising startups . . . empowers trailblazing innovators and entrepreneurs to take their ventures to the next level . . . [and is] [o]pen to students, staff, and alumni from across NYU.'" SAC ¶ 81.

The Challenge usually selects a minimum of 25–35 winners but only twenty winners were selected in the 2021–22 Challenge. *Id.* ¶¶ 90, 112. Defendant advertises that "accepted participants will receive access to exclusive masterclasses, expert coaching, access to MBA venture associates, all while competing for up to $75k in seed funding and pro bono services." *Id.* ¶ 81. Additionally, Defendant described the Challenge as an opportunity to "[t]est your venture (and your mettle) . . . [d]evelop critical skills such as evaluating opportunities, creating marketing plans, preparing financial statements, leading a team, and pitching investors." *Id.* ¶ 82. Selected teams would "[r]eceive one-on-one coaching, mentoring and feedback from experienced entrepreneurs and executives as well as seasoned investors." *Id.* Participants would be able to

"[n]etwork with successful VCs, entrepreneurs, angel investors, Stern alumni and others from the entire NYU community." *Id.*

Plaintiff entered Activate for the 2021–22 Challenge and paid the "voluntary but recommended" $100 entry fee for alumni. *Id.* ¶ 96. According to the rules of the Challenge, neutral third-party judges would select ventures with "strong connections to NYU . . . strong founding teams . . . [and] the potential to achieve tremendous scale" that are "'World Positive' . . . and solve a worthwhile problem, [and] demostrat[e] progress through a prototype, transaction or other means." *Id.* ¶ 90. Illegal ventures are not allowed. *Id.* The Challenge also offered workshops, team-building events, networking forums and coaching sessions. *Id.* ¶ 162. Challenge competitors were encouraged "to attend as many of the events as possible." *Id.* Prizes of $300,000 and $225,000 were available for the 2021–22 and 2023–24 Challenges respectively. *Id.* According to the NYU Entrepreneurs Challenge Eligibility Statement, the prizes "are intended for plans that the judges believe can become viable, operating businesses of significant economic scale." *Id.* ¶ 94. It is also a tradition that the winner of the Challenge is awarded a bottle of champagne, which is sponsored by the Challenge's alcohol sponsor, Veuve Cliquot. *Id.* ¶¶ 156– 157.

On November 20, 2021, Plaintiff received an email from NYU that Activate was not selected for further advancement in the 2021–22 Challenge. *Id.* ¶ 110. The email stated that "[w]hile all the ideas reviewed had merit, the teams that were selected were deemed to have the strongest rationales for how to create, deliver, and capture value in the markets." *Id.* Evaluators provided anonymous feedback on Activate, including that the "application doesn't hone in on a key problem that the market is facing right now," that "it's unclear what the solution is, how it will make money, how it will work, and what it will do," and that "[i]t's also unclear how [Activate]

will even address any of the larger problems that were posed in the application." *Id.* ¶¶ 139, 143–144. Another evaluator stated, "[i]t's also unclear why anyone would pay for this or what it actually is." *Id.* ¶ 139.

Plaintiff applied for the 2023–24 Challenge on October 30, 2023, noting that the "application had mandatory gender and race identifying questions, as well as mandatory headshots of all team members." *Id.* ¶¶ 97, 234–235. He again paid the recommended $100 entry fee. *Id.* ¶ 97. When NYU circulated the 25 teams selected for the Challenge in an email dated December 11, 2023, Plaintiff realized that he "was not selected and his submission was not recognized with a rejection email . . . nor was the $100 fee for applicants returned." *Id.* ¶¶ 240–241.

NYU's Berkeley Center offers startup advising services to students and alumni. *Id.* ¶¶ 158–159. NYU informational materials state that the Berkley Center offers "a collection of appointments in many, many different flavors, [including] . . . startup financials helpdesk, marketing helpdesk, a branding help desk, prototyping help desk, [and] all sorts of help-desks to assist you with questions in a number of different subject areas all related to startups." *Id.* ¶ 163. The Berkley Center's website stated that alumni "can make as many appointments as [they] need, and in the different areas [they] may need assistance in." *Id.* ¶ 165. In Fall 2021, Plaintiff signed up for five thirty-minute advising sessions with the Berkley Center. *Id.* ¶ 168. Around late October or early November 2021, plaintiff's scheduled start-up advising sessions were cancelled. *Id.* ¶ 167. On November 30, 2021, Plaintiff received an email from the Director of The Berkley Center stating "[o]ur records show you've had 8 appointments over the past several weeks with our start-up experts. While we're glad you're finding The Berkley Center's Startup Advising services helpful, we must cap access to this very limited resource." *Id.* ¶ 168. Plaintiff thereafter became unable to schedule any further appointments online. *Id.* ¶ 167.

NYU operates a student and alumni program called The Female Founders Fellowship Program. *Id.* ¶ 213–215. Applications are open to "any student, faculty, or staff member regardless of gender, and including but not limited to those who identify as trans, gender non-conforming, non-binary, or genderqueer." *Id.* ¶ 214. The Female Founders Program offers events such as fora, community building activities, and networking opportunities. *Id.* ¶ 215. Among other benefits, members have access to comprehensive startup training, priority access to regular coaching sessions with members of the NYU Entrepreneurial Institute Coaching Team and Founders in Residence, and certain members will receive mentorship from seasoned entrepreneurs and investors. *Id.* Despite permitting male applicants, no man has been selected to join the Female Fellows program. *Id.* ¶¶ 214, 224. In December 2023, Plaintiff asked the Female Founders Fellowship Program Manager if any men have applied for the program. *Id.* ¶ 219. She responded: "Male identifying people do apply. We look for people who's [*sic*] committed and has a track record of improving gender equity." *Id.* Plaintiff does not allege he applied for the program.

The Second Amended Complaint contains a host of statistics purporting to show that female venture founders at NYU are more successful than either female venture founders at other universities or than male venture founders at NYU. *Id.* ¶¶ 207–213. Plaintiff details a host of statics pertaining to female founders at NYU including that a 2018 article published by Forbes stated that 25% of funded ventures at NYU were led by female entrepreneurs, *id.* ¶ 207; NYU's website states that 51% of ventures funded by the NYU Venture Fund are led by women, *id.* ¶ 208; and the 2021 NYU Entrepreneurial Annual Report stated that "more women-led teams were accepted into our accelerators than men-led teams," *id.* ¶ 213.

NYU offers an NYU Gift Guide that showcases student and alumni ventures offering products to be purchased. *Id.* ¶ 183. The form to be included in the NYU Gift Guide contained

race and gender identifying fields such as "Black owned business," and "Women owned business" and invited founders to submit photos of themselves.  *Id.* ¶¶ 192–193.  Plaintiff submitted his fashion label, "The Activate Store" to the Berkley Center's 2023 "Annual Holiday Gift Guide," but it was not included in the Guide.  *Id.* ¶¶ 190–191, 204.

Plaintiff is the founder of The Sir David Amess Peace Initiative, which he describes as "the world's first interfaith sainthood nomination, promoting religious, political and racial unity and tolerance." *Id.* ¶ 26.  On September 28, 2022, Plaintiff attended an on-campus event entitled "How to Make American Discourse Less Stupid."  *Id.* ¶ 67.  During the question-and-answer portion of the event, Plaintiff was called on to participate and started speaking about the Sir David Amess Peace Initiative.  *Id.*  An NYU professor appeared uncomfortable with Plaintiff's contribution and "step[ped] off the stage and pressure[d] [P]laintiff into giving him the microphone." *Id.*  Others in attendance who did not share plaintiff's national origins, religion and race were allowed to speak uninhibited.  *Id.*

On September 30, 2024, Plaintiff attended an on-campus event entitled "Historical Perspectives on the Black Muslim Experience in NYC" at NYU's Islamic Center.  *Id.* ¶ 68.  Plaintiff was handed a microphone during the question-and-answer session, but before he could speak, NYU's University Chaplain and Executive Director of the Islamic Center sent one of the event organizers who put his hands on Plaintiff and told Plaintiff not to speak about or ask a question related to his interfaith peace project.  *Id.*

Plaintiff submitted community prayer requests to the NYU Islamic Center.  *Id.* ¶ 66.  The University Chaplain and Executive Director of the Islamic Center fully censored Plaintiff's prayer requests for success on The Sir David Amess Peace Initiative.  *Id.*   After Plaintiff raised a

complaint with the Chaplain's supervisors, the Islamic Center published watered-down versions of the prayer requests. *Id.*

## PROCEDURAL HISTORY

The complete procedural history of this case is set forth in the Court's Opinion and Order of September 29, 2023.  Dkt. No. 63 at 5–7.  In brief, Plaintiff, acting pro se, filed his initial complaint on May 9, 2022.  Dkt. No. 1.  On July 26, 2022, Defendant filed a motion to dismiss the complaint along with a memorandum of law and affidavit in support of the motion, Dkt. Nos. 19–21, which this Court dismissed as moot when Plaintiff filed his First Amended Complaint on November 9, 2022, Dkt. Nos. 37, 41.  Defendant moved to dismiss the First Amended Complaint on January 13, 2023.  Dkt. Nos. 46–48.  The Court granted Defendant's motion without prejudice, allowing Plaintiff to file a second amended complaint within sixty days of the decision.  *Id.* at 63. Plaintiff submitted his Second Amended Complaint on December 23, 2023.  Dkt. No. 70.

On February 29, 2024, Defendant filed its motion to dismiss the Second Amended Complaint along with a memorandum of law and affidavit in support of the motion.  Dkt. Nos. 74–76.  On April 30, 2024, Plaintiff filed a memorandum of law in opposition to Defendant's motion to dismiss.  Dkt. No. 80.  On May 13, 2024, Defendant filed a reply memorandum of law in support of the motion.  Dkt. Nos. 81–82.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement."  *Twombly*,

550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

The Court construes pro se pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest.  *See Abbas v. Dixon*, 40 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000).  This obligation "is especially true when dealing with pro se complaints alleging civil rights violations." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146 (2d Cir. 2002).  However, while the Court construes pro se pleadings liberally, this does not relieve pro se plaintiffs of the requirement that they plead enough facts to "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure.  *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007).  "Thus, the Court's 'duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it.'" *Davila v. Lang*, 343 F. Supp. 3d 254, 266 (S.D.N.Y. 2018) (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009)).

## DISCUSSION

Plaintiff repeats many of the same claims that he previously pleaded in his First Amended Complaint, Dkt. No. 35, and that were dismissed for failure to state a claim, Dkt. No. 63.  Those repeated claims are: (1) violation of Title VI; (2) violation of 42 U.S.C. § 1981; (3) violation of

Title IX; (4) violation of NYSHRL § 296, *et seq.*; (5) violation of NYCHLR §§ 8-107(4) and (17); (6) breach of contract and the implied covenant of good faith and fair dealing; (7) violation of the Deceptive Practices Act; and (8) violation of the False Advertising Act.  *Compare* SAC *with* Dkt. Nos. 35, 63.

Construing the Second Amended Complaint liberally, Plaintiff adds three additional claims: (1) violations of his free speech and religious liberty rights under the First Amendment of the U.S. Constitution;[1] (2) breach of New York Civil Rights Law Section 40-c; and (3) breach of the Communications Act of 1934.  *Id.*

For the following reasons, the motion to dismiss is granted.

## I.    Federal Discrimination Claims

Plaintiff repeats his prior claims that Defendant discriminated against him in violation of Title VI, Title IX, and Section 1981.  *See* Dkt. No. 70 ¶¶ 246–261, 300–307.  As in his First Amended Complaint, Plaintiff asserts that Defendant discriminated against him on the basis of his race, skin color, religion, and national origin.  *Compare id. with* Dkt. No. 37 ¶¶ 8–10, 16; Dkt. No. 63 at 39.

The Court previously dismissed Plaintiff's Title VI, Title IX, and Section 1981 claims for failure to plead that Defendant discriminated against him in its administration of the Challenge or Hackathon.  *Id.* at 39–46.  The Court noted that "Plaintiff did not allege Defendant made any remarks indicating animus on the basis of race or national origin or otherwise evinced such animus" and that "[t]he comments that Plaintiff received on his submissions are race- and national-

---

[1] Construing Plaintiff's Second Amended Complaint liberally, the Court assumes he intended to bring a claim under 42 U.S.C. § 1983 for violations by Defendant of his rights under the First Amendment of the U.S. Constitution.  SAC ¶¶ 64–71.  However, Plaintiff would be unable to succeed as he failed to allege that "the conduct complained of . . . [has] been committed by a person acting under color of state law."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  That claim is therefore dismissed.

origin neutral." *Id.* at 42.  The Court additionally stated that Plaintiff's allegations that one out of the twenty-two Challenge award recipients was a White woman and that Defendant receives funds from the Rennert Family Foundation did not give rise to an inference of discrimination.  *Id.* at 39–46.  Those repeated allegations once more fail to support Plaintiff's Title VI, Title IX, and Section 1981 for the same reasons.  *Id.*

The SAC adds several new allegations in support of his discrimination claims.  Namely, he newly alleges that (1) a White woman and a Black woman, both participating in the Hackathon as solo founders, were selected ahead of plaintiff due to their race, national origin or gender, SAC ¶ 119–120; (2) The Activate Store's exclusion from the NYU Gift Guide was motivated by gender and race discrimination, *id.* ¶¶ 183–204; (3) Plaintiff was censored at two on-campus events and in NYU Islamic Center emails based on his national origin, race, and religion, *id.* ¶¶ 65–68; and (4) statistical evidence concerning the percentage of female venture founders at NYU shows gender discrimination, *id.* ¶¶ 207–213.

The legal standards for Plaintiff's Title VI, Title IX, and Section 1981 claims parallel one another.  Title VI of the Civil Rights Act of 1964 prohibits education programs that receive federal funding from discrimination on the ground of race, color, or national origin.  42 U.S.C. § 2000d. To state a Title VI claim, Plaintiff must "show, through specific factual allegations, that '(1) the defendant discriminated on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action.'"  *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *14 (S.D.N.Y. Sept. 27, 2012) (quoting *Faccio v. Eggleston*, 2011 WL 3666588, at *9 (N.D.N.Y. Aug. 22, 2011).  Title IX was modeled after Title VI "which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education

programs." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  To state a Title IX claim, "a plaintiff must show that: (1) the defendant was discriminated against, (2) the discrimination was intentional, and (3) the discrimination was a 'motivating factor' in the defendant's actions." *Pungitore v. Barbera*, 506 Fed. App'x 40, 42 (2d Cir. 2012) (internal citation omitted).  "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *see also* Dkt. No. 63 at 45 ("The activities enumerated in Section 1981 are those 'to make and enforce contracts, to sue, be parties, [and to] give evidence.'").[2]

None of Plaintiff's new allegations suffice to demonstrate the discriminatory intent required to state a claim under Title VI, Title IX, or Section 1981.  "A plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994).  "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent."  *Id.* "Typically, facts that support an inference of racial animus relate to long-term practices of discrimination, or to comments made by individuals suggesting that they harbor racial biases."

---

[2] None of Plaintiff's new allegations of discrimination concern an activity enumerated in Section 1981 and Plaintiff's Section 1981 claims are therefore additionally dismissed for that reason.

*HB*, 2012 WL 4477552, at *14 (quoting *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 414 (E.D.N.Y. 2009)).

With regard to the Hackathon, Plaintiff is unable to allege disparate treatment because he does not show that he was similarly situated to the individuals of a different race, national origin or gender selected in his stead. *See Johnson v. N.Y.U.*, 800 F. App'x 18, 21 (2d Cir. 2020) ("While a plaintiff may 'raise[] an inference of discrimination by showing that [he] was subjected to disparate treatment' in comparison to others, the comparators must be 'similarly situated' to the plaintiff 'in all material respects.'" (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted))). Of the two women Plaintiff identified as being selected for the Hackathon in place of Plaintiff, one proposed a digital venture that connects cooks to "cook, clean and shop" for affluent families" which is markedly distinct from Plaintiff's social media website that was not yet public. SAC ¶¶ 32, 119. Plaintiff does not allege what the other's proposed venture was. "Plaintiffs' 'bald assertions of discrimination and retaliation, unsupported by any comments, actions, or examples of similarly-situated individuals outside of [their] protected class being treated differently' do not permit the [C]ourt to infer that [Defendant] possessed a discriminatory motive. *Minto v. Molloy Coll.*, 2019 WL 4696287, at *11 (E.D.N.Y. Sept. 26, 2019) (quoting *Jackson v. County of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011)). Indeed, Plaintiff does not allege that the Hackathon judges were aware of the race, national origin, or gender of any applicant such that the decision could have been prompted by discriminatory intent. Plaintiff also does not allege that Defendant made any remarks to Plaintiff that could indicate discriminatory animus. *See Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 527 (S.D.N.Y. 2013) (dismissing federal discrimination claim because "[n]owhere in Plaintiff's complaint or opposition to Defendant's motion to dismiss does Plaintiff allege that Defendant

referred to his race or gender.").  For example, although alcohol is gifted to Challenge winners, SAC ¶ 157, Plaintiff does not allege that it is accompanied by any statement denigrating individuals who do not drink for religious or other reasons.  *See e.g.*, *Hoxhaj v. Michael Cetta, Inc.*, 2023 WL 3455444, at *12 (S.D.N.Y. May 15, 2023) (defendant's statement that Muslim people are "crazy" because of his belief that they do not drink alcohol "could be viewed by a reasonable juror as reflecting a discriminatory animus").

With regard to the Gift Guide, Plaintiff alleges that while excluding his apparel brand, the 2023 Gift Guide included three other apparel brands: one by a White man, one by a Latinx woman, and one by a woman of unspecified race.  SAC ¶ 196.  Again, this allegation does not establish the requisite discriminatory animus "without pleading additional facts that [Plaintiff] was similarly situated in all material respects to those comparator [applicants]."  *Karunakaran v. Borough of Manhattan Cmty. Coll.*, 2021 WL 535490, at *5 (S.D.N.Y. Feb. 12, 2021).  Plaintiff does not allege what the criteria for inclusion in the Gift Guide were, whether The Activate Store or the chosen ventures met those criteria, or any other circumstances regarding his comparable merit.  *See Feliz v. M.T.A.*, 2017 WL 5593517, at *6 (S.D.N.Y. Nov. 17, 2017) (holding plaintiff "does not allege facts sufficient to nudge his discrimination claim over the line from 'conceivable' to 'plausible'" where he "does not plead 'sufficient factual circumstances' regarding his skill or experience as compared to the successful applicants from which . . . gender and national origin based discrimination can be inferred." (citations omitted)).  Plaintiff pleads only that The Activate Store "is a fashion label that sells apparel and accessories online to the fashion and socially conscious consumer" and that "[t]he website states that the store distributes 99% of profits."  SAC ¶ 190.  Plaintiff does not allege that the three accepted apparel ventures operated similarly or even sold similar types of apparel—a tremendously broad category that encompasses a plethora of wearable

items. *Id.* ¶ 196. "Plaintiff has not adequately pleaded allegations from which it is plausible to conclude that the comparators are similarly situated, and, therefore, has not adequately alleged disparate treatment that could plausibly support even a minimal inference of discrimination." *Opoku v. Brega*, 2016 WL 5720807, at *9 (S.D.N.Y. Sept. 30, 2016) (citation omitted). Plaintiff additionally does not allege that any person or entity involved in selecting ventures to appear in the Gift Guide made any statement evincing discriminatory animus. *See Manolov*, 952 F. Supp. 2d at 527.

Plaintiff's allegations surrounding censorship also do not give rise to an inference of discriminatory intent. All three examples surround Plaintiff's attempts to discuss the Sir David Amess Peace Initiative in NYU spaces. SAC ¶¶ 66 (requesting prayers though the Islamic Center), 67 (at an on-campus event titled "How to Make American Discourse Less Stupid"), and 68 (at an on-campus event titled "Historical Perspectives on the Black Muslim Experience in NYC"). Though Plaintiff alleges that individuals with different national origins than Plaintiff were permitted to speak in those spaces, he falls short of alleging that those others were similarly situated. He does not allege that any putative comparator attempted to speak about the Sir David Amess Peace Initiative or any other topic that would make them similarly situated. *See Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.*, 2009 WL 3682458, at *7–8 (S.D.N.Y. Oct. 29, 2009) (a proposed comparator is not similarly situated unless they engaged in the same supposedly objectionable behavior). And Plaintiff does not plead any other fact that might permit the Court to infer that the censorship was based on Plaintiff's protected traits rather than on the specific content of his speech.

Finally, Plaintiff's statistical allegations do not warrant an inference of gender bias. It is true that in some circumstances, statistical allegations will, on their own, be sufficient to prompt an inference of discriminatory intent. *See Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69

(2d Cir. 2015) (citing *United States v. City of New York*, 717 F.3d 72, 84 (2d Cir. 2013); *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980)).  However, for statistics to give rise to such an inference, they "must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Id.* (collecting cases).

Plaintiff's allegations do not rise to that level.  Plaintiff alleges that: 25% of funded ventures at NYU are women-led; 51% of ventures funded by the NYU Venture Fund are women-led; 40% of venture founders are women-led; 42% of participants in the social venture competition are women-led; 61% of January 2018 Start-up sprint participants were women-led; in 2019 there was 50% or greater female participation in: Summer Launchpad, Startup Sprints, Healthcare Markethon participants and winners, Entrepreneurs Festival speakers, Leslie eLab visits, and Innovation Venture Fund investments; and that in 2018 and 2020 "more" women-led teams were accepted into NYU startup accelerators than male-led teams.  SAC ¶¶ 207–213.[3]  These statistics barely show approximate parity and certainly do not make "non-discriminatory explanations very unlikely." *Burgis*, 798 F.3d at 69.  Furthermore, these statistics do not evidence discriminatory intent "without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those [selected] for each position, or the number of openings." *Id.* (citing *Lomotey v. CT Dep't of Transp.*, 355 F.App'x 478, 481 (2d Cir. 2009) (summary order)).

---

[3] Plaintiff also alleges that between 2017 and 2019, approximately 80% of teams accepted into the Summer Launchpad Accelerator program "ha[d] female founders." *Id.* ¶¶ 210–212.  However, because a team can consist of numerous people who need not be of the same gender, the high percentage of accepted female founders does not convey a low percentage of accepted male founders and therefore does not indicate discriminatory intent.

Ultimately, Plaintiff does not plead a minimal inference of discriminatory intent on the basis of his race, skin color, national origin, or gender, and therefore his Title VI, Title IX, and Section 1981 claims must be dismissed.

## II.    State Discrimination Claims

The Second Amended Complaint asserts claims for public accommodations discrimination under the NYSHRL and NYCHRL.  SAC ¶¶ 262–288.[4]  The Second Amended Complaint additionally asserts a claim for disparate impact under the NYCHRL.  SAC ¶ 294.  Finally, the Second Amended Complaint contains a separate cause of action for violation of NYCRL § 40-c. *Id.* ¶¶ 278–288.

The NYSHRL states that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager superintendent, agent or employee of any place of public accommodation . . . because of the race, creed, color, national origin, citizenship or immigration status . . . [or] sex . . . to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."  NYSHRL § 296(2)(a).  Here, Plaintiff alleges that Defendant denied him "the full and equal enjoyment . . . of NYU's accommodations, advantages, services, facilities or privileges, . . . resulting in a disparate impact."  SAC ¶¶ 292–293.  Plaintiff states in his memorandum of law in opposition to the motion to dismiss that a "school by legal definition is a place of public accommodation."  Dkt. No. 80 at 2.  The statute, however, expressly provides that the term "place of public accommodation" shall not

---

[4] In the Court's Opinion and Order on Defendant's prior motion to dismiss Plaintiff's First Amended Complaint, the Court dismissed Plaintiff's claims for violation of the NYCHRL and NYSHRL because Plaintiff was not an employee or a covered non-employee entitled to bring such claims.  Dkt. No. 63 at 9 n.5.  The Second Amended Complaint does not rectify that issue and so to the extent Plaintiff's claims are premised on employment discrimination under either the NYCHRL or NYSHRL, they must again be dismissed.  The Court instead construes Plaintiff's claims as complaining of public accommodations discrimination.

include "academies, colleges and universities." NYSHRL § 292(9). Defendant, a university, thus squarely falls under this exception. *See Novio v. N.Y. Acad. of Art*, 286 F. Supp. 3d 566, 580 (S.D.N.Y. 2017) (finding that the New York Academy of Art, a private art school, is not a "place of public accommodation" under NYSHRL § 292(9)). Plaintiff therefore fails to state a claim under Section 296(2) of the NYSHRL.

Plaintiff's discrimination claim under Section 40-c of the NYCRL rises and fall with his discrimination claim under the NYSHRL. *See Roenick v. Flood*, 2021 WL 2355108, at *6 n.2 (S.D.N.Y. June 9, 2021); *Hyman v. Cornell Univ.*, 2017 WL 1194231, at *10 (N.D.N.Y. Mar. 30, 2017), *aff'd*, 721 F. App'x 5 (2d Cir. 2017). "The New York State Human Rights Law is composed of the New York Executive Law §§ 292 *et seq.* (which provides the substance of the law) and the New York Civil Rights Law §§ 40 *et seq.* (which provides for penalties)." *Thorne v. Formula 1 Motorsports, Inc.*, 2019 WL 6916098, at *3 (S.D.N.Y. Dec. 19, 2019). Because Plaintiff's NYSHRL claim fails, his NYCRL claim must also be dismissed. *See Roenick*, 2021 WL 2355108, at *6 n.2.

Section 8-107(4) of the NYCHRL states that it is an 'unlawful discriminatory practice' for any "provider of a public accommodation . . . [t]o refuse, withhold from or deny to [any] person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation" on the basis of such person's "actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation, uniformed service, height, weight, or immigration or citizenship status." NYCHRL § 8-107(4). "The statute also forbids any employee of a public accommodation from 'directly or indirectly' making any declaration that the "patronage or custom of any person is unwelcome, objectionable, not acceptable, undesired or

unsolicited because of such person's actual or perceived race." *Benzinger v. NYSARC, Inc.*, 385 F. Supp. 3d 224, 238 (S.D.N.Y. 2019) (quoting NYCHRL § 8-107(4)(a)(2)).

Unlike the NYSHRL, the NYCHRL does not exclude "academies, colleges and universities" from the definition of public accommodations. NYCHRL § 8-102; *see also* NYCHRL § 8-130(b) ("Exceptions to and exemptions from the provisions of this title shall be construed narrowly in order to maximize deterrence of discriminatory conduct."); *Doe v. Yeshiva Univ.*, 2023 WL 8236316, at *19 (S.D.N.Y. Nov. 28, 2023) (holding that a private religious university is a place of public accommodation); *YU Pride Alliance v. Yeshiva Univ.*, 180 N.Y.S.3d 141 (1st Dep't 2022) (same).

Nonetheless, Plaintiff's NYCHRL accommodations claim fails because he does not adequately allege any act of discrimination. "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive." *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014). "Still, the liberal standards of the NYCHRL do not go so far as to establish a 'general civility code.'" *Nezaj v. PS450 Bar & Rest.*, 2024 WL 815996 at *8 (S.D.N.Y. Feb. 27, 2024) (quoting *Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d 27, 40 (1st Dep't 2009)). Plaintiff again fails to make any plausible allegations that would establish discriminatory differential treatment. *See Gorokhovsky*, 552 F. App'x at 102. As explained, *supra*, the mere fact that individuals who do not share Plaintiff's race, religion, gender, and/or national identity were selected for programs— while Plaintiff was not—is insufficient to establish discriminatory differential treatment in the absence of any further allegation that those others were similarly situated to Plaintiff. *See Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 509 (2d Cir. 2020) (summary order) (NYCHRL claims properly dismissed where plaintiff failed to give any indication she was "sufficiently similarly

situated" to proposed comparators "plausibly to suggest a discriminatory motive). Likewise, Plaintiff fails to point to any statement by Defendant that even references his race, religion, gender, or national origin as a motive for its decision. *See Manolov*, 952 F. Supp. 2d at 527.

Plaintiff additionally claims that Defendant's "actions and omissions have resulted in a disparate impact to the detriment of [P]laintiff, in violation of [NYCHRL] § 8-107(17)." SAC ¶ 294. Section 8-107(17) of the NYCHRL defines "[a]n unlawful discriminatory practice based upon disparate impact" as "a policy or practice . . . [that] results in a disparate impact to the detriment of any group protected [by the NYCHRL]." A plaintiff claiming disparate impact must "(1) identify a specific . . . practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (citations omitted). "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dept.*, 352 F.3d 565, 575 (2d Cir. 2003); *see Chalmers v. City of N.Y.*, 2021 WL 4226181 at *5 (S.D.N.Y. Sept. 16, 2021) ("To survive a motion to dismiss, [p]laintiffs must merely allege sufficient facts to support a plausible claim that . . . [a] facially neutral practice or policy disproportionately and adversely affects a particular protected group."). Plaintiff has not plausibly alleged that any disparity exists. The statistics he cites regarding gender disparities between male and female venture founders at NYU demonstrate that men and women had generally equivalent levels of success pursuant to the various cited metrics and Plaintiff does not allege that any study was "statistically significant." SAC ¶¶ 207–213; *Burgis*, 798 F.3d at 69; *supra* pp. 15–16.

Plaintiff's NYSHRL, NYCHRL, and NYCRL claims are therefore dismissed.

III.     **New York Deceptive Practices Act and New York False Advertising Act Claims**

Plaintiff next repeats the claim from his First Amended Complaint that Defendant's actions violated GBL Sections 349 and 350.  He alleges that "NYU's conduct, statements, and representations . . . were consumer-oriented and were aimed at . . . a large consumer group, namely, prospective and current students and alumni."  SAC ¶ 339.  He argues that Defendant deceived him by "falsely causing [P]laintiff to believe that if he paid tuition and fees to NYU, then NYU would uphold, adhere to, and comply with its stated rules and policies."  *Id.* ¶ 342.  Plaintiff further alleges that Defendant engaged in false advertising by "falsely leading [P]laintiff to believe that NYU would . . . provide [P]laintiff with numerous well-defined alumni benefits following the completion of 13 credits, including Berkley Center programs and services."  *Id.* ¶ 351.

Section 349 of the GBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  GBL § 349(a).  Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  GBL § 350.  "The only difference between the two is that Section 350 more narrowly targets deceptive or misleading advertisements, while Section 349 polices a wider range of business practices."  *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 636 (S.D.N.Y. 2016).  To state a claim under either Section 349 or 350, "a plaintiff must allege: (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result."  *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 675 (S.D.N.Y. 2021); *see Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (At the pleading stage, plaintiff must allege that "on account of a materially misleading practice, [the plaintiff] purchased a product and did not receive the full value of [their] purchase.").

"To satisfy the 'consumer-oriented' prong, the plaintiff must 'demonstrate that the acts or practices have a broader impact on consumers at large.'" *Manchanda v. Navient Student Loans*, 2020 WL 5802238, at *5 (S.D.N.Y. Sept. 29, 2020) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995)). "Private contract disputes, unique to the parties . . . [will] not fall within the ambit of the statute." *Oswego*, 647 N.E.2d at 744. For a challenged act or practice to be considered misleading, it must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 745.

In determining whether a statement is deceptive, courts analyze the challenged material "as a whole, including disclaimers and qualifying language." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018). "[C]ontext is crucial." *Fink v. Time Warner*, 714 F.3d 739, 742 (2d Cir. 2013); *see also Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) ("Courts 'view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.'" (quoting *Wurtzburger v. Ky. Fried Chicken*, 2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017))); *Steele v. Wegmans Food Mkts., Inc.*, 472 F. Supp. 3d 47, 50 (S.D.N.Y. 2020) ("Although they are processed almost simultaneously by the buyer, to analyze the total effect of the messages on the container it is useful to consider them in sequence."). In addition, "[s]tatements that are mere puffery cannot support a claim under GBL §§ 349 or 350." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020); *see id.* ("Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language" that consists of "[s]ubjective claims about products, which cannot be proven either true or false" because they "make no specific claims on which consumers could rely." (citations omitted)).

In order to satisfy the third prong, the plaintiff must show that "the deceptive act or practice . . . caused actual, although not necessarily pecuniary, harm." *Oswego*, 647 N.E.2d at

745; *accord Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999).  "Although a private plaintiff need not plead or allege reliance under Section 349 . . . [they are] required to show that the material deceptive act caused the injury." *Rivera v. Navient Sols., LLC*, 2020 WL 4895698, at *7 (S.D.N.Y. Aug. 19, 2020).

Plaintiff presents two theories of deceptive advertising or practice.  Both fail.

First, he asserts that "NYU's conduct, statements, and representations" included its "(i) Non-Discrimination and Anti-Harassment Policy; (ii) Faculty Handbook; (iii) Code of Ethical Conduct; (iv) Rules for the Maintenance of Public Order; and (iv) website, including its Mission Statement and University Initiative pages" are deceptive.  SAC ¶¶ 57–63, 339–342.  Plaintiff alleges that those documents give rise to liability because they "caused Plaintiff injury by causing him to enroll at NYU and to pay tuition and fees to NYU based on the reasonable understanding that NYU would apply, enforce, and follow through on its codes and policies . . . concerning protecting students and alumni from discrimination based on their race, national origin, ethnicity, and ancestry, would otherwise seek to protect students and alumni from discrimination."  SAC ¶ 344.  However, as explained *supra*, Plaintiff has not adequately alleged that Defendant perpetrated any act of discrimination against Plaintiff and Plaintiff does not otherwise allege that he was subjected to discrimination from which Defendant failed to protect him in violation of its policies and representations.  Nor does Plaintiff plead that Defendant generally disregarded the non-discrimination policies with regards to other individuals.  Plaintiff therefore does not allege that Defendant's statements and conduct were deceptive such that the deceit could have caused him any injury.  *See Segovia v. Vitamin Shoppe, Inc.*, 2016 WL 8650462, at *8 (S.D.N.Y. Feb. 5, 2016) (dismissing claims under GBL Sections 349 and 350 for failure to allege that the statements were misleading and noting that "it is well settled that a court may make this determination as a

matter of law").   Plaintiff's GBL claims cannot survive where Defendant has made "true statements and therefore not misleading statements."  *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 563 (S.D.N.Y. 2005); *see also Reyes v. Crystal Farms Refrigerated Distribution Co.*, 2019 WL 3409883, at *3 (E.D.N.Y. July 26, 2019) ("The statement "made with real butter" does not violate NY GBL §§ 349 and 350 because it is not misleading.  Defendant's mashed potatoes contain butter."); *Sarr v. BEF Foods, Inc.*, 2020 WL 729883, at *4 (E.D.N.Y. Feb. 13, 2020) (similar).

Plaintiff's second theory is premised upon Defendant's "conduct, statements, and representations" regarding alumni benefits.  SAC ¶¶ 349–355.  For example, Plaintiff cites language in "NYU brochures" stating that "NYU Stern offers opportunities for alumni to continually develop and grow," "alumni can explore entrepreneurship support," and "we greatly value alumni participation in sponsored activities."  SAC ¶¶ 73, 76;  *see also id.* ¶¶ 75 ("A 2006 NYU website" states that "The [Berkley] Center offers a unique set of co-curricular programs that are designed to help Stern students and alumni launch businesses."); 80 (NYU's current website states that "The Berkley Center for Entrepreneurship provides a number of programs and services to support NYU community members with an interest in creating new ventures . . . [and] provides startup acceleration programs, mentoring, workshops and technical assistance, all designed to provide NYU students, alumni, faculty and staff with the skills and resources needed to discover and execute bold new ideas.").

Such statements represent a mix of truthful statements and nonactionable puffery.  Statements that NYU offers certain programs are capable of objective verification—if NYU did not offer such programs, such statements would be false.  However, Plaintiff does not allege that the Berkley Center does not, in fact, provide a number of programs and services for entrepreneurs

including workshops and technical assistance. Plaintiff affirmatively alleges that it does. *E.g.*, SAC ¶¶ 136 (Plaintiff had an on-boarding startup advising session with the Associate Director of The Berkley Center), 167–169 (Plaintiff scheduled start-up advising sessions). Plaintiff therefore fails to plead that Defendant's statements regarding the provision of such programs and services is misleading. *See Cyco.Net, Inc.*, 383 F. Supp. 2d at 563; *Sarr*, 2020 WL 729883, at \*4. Indeed, over a decade after his graduation, Defendant allowed Plaintiff to participate in competitions primarily targeted at students, made available over two hours of free startup advising sessions, and generally permitted him to participate in public, on-campus events.

The remaining portions of the allegedly misleading statements constitute puffery. *See Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) ("Whether a statement is puffery is a legal question that may be determined from the allegations in the complaint."). Defendant's representations that, for example, its programs and services are "designed to provide NYU students, alumni, faculty and staff with the skills and resources needed to discover and execute bold new ideas" or that "we greatly value alumni participation in sponsored activities" take the form of vague, generalized, and subjective statements. SAC ¶¶ 73, 80; *see Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at \*16 (S.D.N.Y. Aug. 12, 2016) ("[P]uffery turns on such factors as the 'vagueness,' 'subjectivity,' and 'inability to influence . . . buyers' expectations.'" (quoting *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 392 (E.D.N.Y. 2013)); *Leonard v. Abbott Lab'ys, Inc.*, 2012 WL 764199, at \*21 (E.D.N.Y. Mar. 5, 2012) ("[S]tatements that are vague or either mere puffery or hyperbole such that a reasonable consumer would not view them as significantly changing the general gist of available information are not material, even if they were misleading." (citation omitted)).

Plaintiff's claims that Defendant engaged in deceptive practices or false advertising in violation of Sections 349 and 350 of the GBL are dismissed.

## IV.    Breach of Contract

Plaintiff alleges that Defendant breached three "implied or express contractual relationship[s]."  SAC ¶ 317.  The first "implied or express contractual relationship," Plaintiff alleges, "existed between NYU and [P]laintiff . . . as defined by and through NYU codes, policies, and procedures, including but not limited to the Non-Discrimination Policy," and was allegedly breached by Defendant's failure to uphold its non-discrimination policies.  *Id.* ¶¶ 316–323. Second, Plaintiff alleges that "NYU made express and implied contractual commitments to [Plaintiff] concerning a wide array of very specific and well detailed alumni benefits that have subsequently been denied."  *Id.* ¶ 325.  Third, Plaintiff alleges that he entered into another set of contracts when he applied to the 2021–22 and 2023–24 Challenges and paid the requisite entry fees, *id.* ¶ 332, which he alleges Defendant violated by not adhering to the Challenge's stipulated rules, *id.* ¶ 334.  Defendant additionally alleges that, with regard to the Challenges, "NYU also has breached the implied covenant of good faith and fair dealing with bad faith evaluations of plaintiff's venture and sabotaging plaintiff's selection."  *Id.* ¶ 335.

Defendant responds that none of Plaintiff's previous enrollment at NYU, his alumni status, or NYU's policies (including its Employee Handbook), created contractual relationships.  Dkt. No. 75 at 14–18.  Defendant additionally argues that, even if there was a contractual relationship between the parties, Plaintiff alleges no facts comprising a breach of such contract.  *Id.* at 18–21.

A contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000) (quoting Restatement (Second) Contracts § 1 (1979)).  To establish an enforceable contract under New York law, there must be "an offer,

acceptance of the offer, consideration, mutual assent, and an intent to be bound." *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (quoting *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (1st Dep't 2009*)); see also Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 658 (2d Cir. 1996) ("A valid contract requires a manifestation of mutual assent to a bargained-for exchange.").

Mutual assent is manifested in "a meeting of the minds." *See Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 587 (S.D.N.Y. 2001) ("Promises become binding when there is a meeting of the minds and consideration is exchanged."), *aff'd*, 306 F.3d 17 (2d Cir. 2002); *Kelly Asphalt Block Co. v. Barber Asphalt Paving Co.*, 105 N.E. 88, 89 (N.Y. 1914) ("A contract involves a meeting of the minds of the contracting parties.").

For consideration to be valid, it must be "bargained for," meaning that the promisor must seek it in exchange for his promise, and the promisee must give it in exchange for that promise. *See Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) ("Consideration is simply a bargained-for exchange of promises or performance."); *Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2000) ("Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor."); *Von Bing v. Mangione*, 766 N.Y.S.2d 131, 133 (3d Dep't 2003) (same); Restatement (Second) Contracts § 71 (same).  Although "the adequacy of consideration is not a proper subject for judicial scrutiny," consideration is only effective if "something of 'real value in the eye of the law' was exchanged." *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (citation omitted).  In a case for breach of contract, "when it is clear from the face of the pleading and the terms of the contract that a promise is gratuitous, the complaint will be dismissed." *Startech, Inc.*, 126 F. Supp. 2d at 236.

27

An implied contract "may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506–07 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)). "A contract implied in fact is as binding as one that is express, and similarly 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Id*. at 507 (quoting *Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999)).

In order to state a breach of contract claim under New York law, Plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). "A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'" *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)); *see Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021) (same), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021). "New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'—in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'" *Anders v. Verizon Commc'ns*, 2018 WL 2727883, at *8 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)). "It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe that they are bound,

if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Foros Advisors LLC v. Digit. Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018) (quoting *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)). "Thus, to plead a claim for breach of contract . . ., plaintiff 'must provide specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue.'" *Nuevos Aires Shows LLC v. Bühler*, 2020 WL 1903995, at \*4 (S.D.N.Y. Apr. 17, 2020) (quoting *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 327 (S.D.N.Y. 2011)).

Plaintiff fails to state a claim for breach of contract pursuant to any of the three theories, albeit for different reasons.

### A.    NYU's Non-Discrimination Policies

Plaintiff alleges that "an implied or express contractual relationship existed" between him and Defendant "by virtue of [P]laintiff's enrolment [*sic*] at NYU and alumnus status, and as defined by and through NYU codes, policies, and procedures, including but not limited to the Non-Discrimination Policy." *Id*. ¶ 317. Plaintiff  identifies several provisions in NYU's "Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees" that he alleges are part of a contract between him and NYU including that that "all faculty are expected to carry out their institutional responsibilities in accordance with legal and ethical principles" and that "[e]very member of the University is expected to become familiar with those . . . University rules . . . and to comply with both their letter and spirit." *Id*. ¶ 320. Plaintiff argues that Defendant breached this contract by not upholding its non-discrimination policies when allegedly censoring him at various events, *id*. ¶¶ 64–68, discriminating against him by excluding him from certain

alumni benefits, *id.* ¶¶ 79–98, 158–173, 182, discriminating against him during the Hackathon and Challenge, *id.* ¶¶ 118–135, 154–157, 228, and discriminating against him in relation to various other programs, *id.* ¶¶ 183–197.

First, "broad pronouncements of the University's compliance with existing anti-discrimination laws, promising equitable treatment of all students . . . cannot form the basis for a breach of contract claim." *Ward v. N.Y.U.*, 2000 WL 1448641 at *4 (S.D.N.Y. Sept. 28, 2000). "General policy statements and broad and unspecified procedures and guidelines will not suffice" to allege the existence of a contract. *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (internal citations omitted). "[G]eneral promises about ethical standards" that "are subject to neither quantification nor objective evaluation" are "far different from the types of specific promises which have led to valid breach of contract claims against universities." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998); *see also id.* at 208 (a provision in Columbia University's School of Dentistry's Code of Conduct that "[a]ll students should receive fair and equal treatment" "does not create a separate and independent contractual obligation"); *Blaise–Williams v. Sumitomo Bank, Ltd.*, 592 N.Y.S.2d 41, 42 (N.Y. 1993) (pointing out that a "general statement of equal opportunity and nondiscrimination contained in an employee handbook . . . is nothing more than a statement of existing law concerning discrimination [and] may not serve as the basis for a breach of contract claim."). Here, the codes, policies, and procedures that Plaintiff cites, including the Non-Discrimination Policy, clearly fall into the categories of "broad pronouncements of the University's compliance" with existing laws, *Ward*, 2000 WL 1448641 at *4, or "[g]eneral policy statements and broad and unspecified procedures," that "may not form the basis of a breach of contract claim." *Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 812 (S.D.N.Y. 2018).

Second, even if the policies Plaintiff cites could permit inference of a contract, "[t]o state a claim for breach, "a student must identify specific language . . . which establishes the particular 'contractual' right or obligation alleged by the student." *Amable v. New Sch.*, 551 F. Supp. 3d 299, 308 (S.D.N.Y. 2021) (quoting *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021)). This means, "'to state a valid claim for a breach of contract' against a university, a student 'must state when and how the defendant breached the specific contractual promise." *Columbia Tuition Refund*, 523 F. Supp. 3d at 421 (quoting *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)); *see also Gally*, 22 F. Supp. 2d at 207 ("[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted."); *Chira v. Columbia Univ.*, 289 F.Supp.2d 477, 486 (S.D.N.Y. 2003) (dismissing breach-of-contract claim because "although [plaintiff] states there was a contract, he points to no document or conversation that gives rise to a promise which Columbia breached"); *Ward*, 2000 WL 1448641, at *5 ("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim."); *Maas*, 94 N.Y.2d at 93 ("When a complaint merely recites a litany of academic and administrative grievances couched in terms of a violation of a contractual right . . . and is devoid of any reference to the contractual basis for the rights asserted, academic prerogatives should not be channeled into a cognizable contract action classification." (internal citations omitted)).

Here, Plaintiff asserts that Defendant breached its contractual obligations by "selectively enforcing NYU's university bulletins, regulations, codes, policies, and procedures in a discriminatory way." SAC ¶ 322. And although he quotes entire passages from NYU's Non-Discrimination Policy for Employees, *id*. ¶ 320, he does not point to "specific contractual

promise[s]," *Radin*, 2005 WL 1214281, at *10, and merely makes "bald assertions and conclusory allegations claiming that the University's rules or procedures were not followed" which is insufficient to state a valid claim, *Ward*, 2000 WL 1448641, at *5.  Even if Plaintiff had adequately pled that he was subject to discrimination, *see supra*, his breach-of-contract claim would still fail. Although Plaintiff alleges instances of censorship, SAC ¶¶ 64–68, discriminatory denial of alumni benefits, *id.* ¶¶ 79–98, 158–173, 182, discrimination against him during the Hackathon and Challenge, *id.* ¶¶ 118–135, 154–157, 228, and discrimination in relation to miscellaneous other programs, *id.* ¶¶ 183–197, "without the identification of a specific breached promise or obligation," *Gally*, 22 F. Supp. 2d at 207, Plaintiff's "litany of academic and administrative grievances couched in terms of a violation of a contractual right . . . is significantly devoid of any reference to the contractual basis" for the rights asserted, *Gertler v. Goodgold*, 487 N.Y.S.2d 565, 568 (1st Dep't 1985).  The Second Amended Complaint therefore does not state a claim for breach of contract with regard to Defendant's non-discrimination policies, procedures, and university regulations on which relief can be granted.  *See Chira*, 289 F. Supp. 2d at 486.

## B. Alumni Programs

As in his First Amended Complaint, Plaintiff alleges that NYU breached promises it made to him regarding alumni support and programming.  *Compare* Dkt. No. 63 at 15 (summarizing Plaintiff's factual allegations regarding his breach of contract claim) *with* SAC ¶¶ 324–330. Plaintiff realleges that "by virtue of [his] enro[l]lment at NYU and completion of a minimum of 13 credits . . . NYU made express and implied contractual commitments to [him] concerning a wide array of very specific and well detailed alumni benefits that have subsequently been denied." SAC ¶ 325.  In particular, Plaintiff points to alumni brochures which state that "NYU Stern offers opportunities for alumni to continually develop and grow" and that "alumni can explore entrepreneurship support."  *Id.* ¶ 73.  He also points to NYU's website which stipulates that "[t]he

Berkley Center offers a unique set of co-curricular programs that are designed to help Stern students and alumni launch businesses" including "workshops, networking events, coaching events, seminars, Boot Camps, [or] funding sources." *Id.* ¶ 75. The Berkley Center Frequently Asked Questions page addresses the question "is there a limit on how many startup advising appointments I can make?" with the answer "No. You can make as many appointments as you need, and in the different areas you may need assistance in." *Id.* ¶ 165. Plaintiff asserts that Defendant violated these promises by "banning" him from "[a]ll Berkley Center [a]lumni [e]ntrepreneurship [p]rograms" until "he made 'material and demonstrable progress'" in November 2021. *Id.* ¶ 79.

Plaintiff's claim essentially restates the claim previously articulated in his First Amended Complaint, Dkt. No. 37 ¶¶ 1–2, 11, 68, and the claim therefore fails for the same three reasons articulated in the Court's previous Opinion and Order, Dkt. No. 63 at 16–18. First, Plaintiff fails to allege that he provided any form of consideration for the alumni benefits, making Defendant's offer of alumni benefits a gratuitous promise. *Id.* at 16–17. Second, Plaintiff fails to allege "an agreement on all material terms, with definiteness, that Defendant breached" because the statements Plaintiff relies on "are so general as to be unenforceable." *Id.* at 17–18. Third, even if a contract existed, Plaintiff fails to allege violation of any specific promise by Defendant. *Id.* at 18.

### C.    The Challenge Competition

Plaintiff next argues that Defendant breached contracts arising from Plaintiff's applications for the 2021–22 and 2023–24 Entrepreneurs Challenges, SAC ¶¶ 332–335, by not selecting him for the competition even though he "met all eligibility and selection criteria," *id.* ¶ 118, and "objectively submit[ed] one of the strongest teams," *id.* ¶ 235. He argues that Defendant violated its obligations under this alleged contract "by, among other things, failing to comply with Federal,

State and Local laws, and NYU's policies and contest rules." *Id.* ¶ 334. Plaintiff alleges that Defendant failed to comply with eight promises it made as part of his application to the Challenge. In particular, Plaintiff asserts that Defendant failed to (1) select a minimum of twenty-five winners; (2) apply the stated selection criteria to the selection of contestants; (3) rely on competent and neutral third-party judges; (4) apply "federally mandated rules and regulations for skilled contests;" (5) exclude contestants from states where such competitions are allegedly illegal; (6) not discriminate in contravention of the law and NYU's policies; (7) abstain from readjusting the prize amount mid-competition; and (8) judge all eligible applicants. *Id.* ¶ 334. Plaintiff also alleges that Defendant breached a contract with regard to the Challenge because his application was more competitive than several other submissions selected as winners. *E.g.*, *id.* ¶ 242.

This Court previously ruled that Plaintiff has sufficiently alleged that his participation in the 2021–22 and 2023–24 Challenges created a contractual relationship with Defendant. Dkt. No. 63 at 19; *see, e.g.*, *Sargent v. N.Y. Daily News*, L.P., 840 N.Y.S.2d 101, 103 (2d Dep't 2007) ("[T]he rules of a contest constitute a contract offer and . . . the participant's [entry into] the contest 'constitute[s] an acceptance of that offer, including all of its terms and conditions.'" (citations omitted); *Moreno v. Marbil Prods, Inc.*, 296 F.2d 543, 544 (2d Cir. 1961) ("By submitting a postal card entry containing his estimate of the price of the merchandise displayed in each contest, plaintiff accepted the offer and a unilateral contract was created which bound defendants to deliver the prize to the winner."); *Diop v. Daily News, L.P.*, 2006 WL 1041064, at *3 (N.Y. Sup. Ct. 2006) ("It is hornbook law that the rules of a contest constitute a contract offer and that the participant's [entry into] the contest 'constitute[s] an acceptance of that offer, including all of its terms and conditions.'" (quoting *Fujishima v. Games Mgt. Servs.*, 443 N.Y.S.2d 323, 323 (N.Y. Sup. Ct. 1981))). The Court's previous ruling still holds true: "Defendant offered Plaintiff certain benefits

if he participated in the Hackathon and the Challenge, in the form of an opportunity to receive an award, and Plaintiff accepted that offer by submitting an application and paying the entry fee." Dkt. No. 63 at 20.  "All of the elements of offer, acceptance, and meeting of the minds thus appear to have been met."  *Id.*

However, the Court's previous Opinion and Order also held that Plaintiff's allegations that "his non-selection evinces a breach of contract" or that Defendant failed to select between twenty-five and thirty-five winners were insufficient to allege breach because they did "not suffice as a statement of specific provisions of the agreement that were breached as a result of the acts at issue." *Id.* at 20–22.  The Second Amended Complaint fares no better.  The Second Amended Complaint still fails to allege the specific provisions of a contract that Defendant has violated.  *See Anders*, 2018 WL 2727883, at *8 ("New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'—in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'" (quoting *Window Headquarters, Inc.*, 1993 WL 312899, at *3)); *see also Pennolino*, 2023 WL 3383034, at * 13; *Levy v. Bessemer Trust Co., N.A.*, 1997 WL 413079, at *5 (S.D.N.Y. July 30, 1997). "Conclusory allegations that a contract existed or that it was breached do not suffice."  *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017); *accord Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) (same).

In contrast to his First Amended Complaint, Plaintiff does allege the eight specific violations recounted above.  However, he fails to allege that these eight criteria were owed to him as obligations under the Challenge contracts.  In other words, Plaintiff does not point to specific provisions of the offer he accepted or the rules of the contest that Defendant violated.  Instead, he

rephrases and summarizes loose language from NYU's website and personal emails from Berkley Center employees that allegedly promised "prize money of $300,000 in 2021–2022 and $225,000 in 2022–2024," *id*. ¶ 90, and the selection of "a minimum of 25-35 winners," *id*., by "external/third party judges" *id*.  As the Court previously, held, these statements "cannot have constituted the offer which Plaintiff accepted" because they did not appear alongside a mention that "any requirement that an entry fee be paid or that an application be submitted."  Dkt. No. 63 at 21. Without pointing to the specific "terms of the agreement upon which liability is predicated," *Anders*, 2018 WL 2727883, at *8, Plaintiff's claims are nothing more than "[c]onclusory allegations that a contract existed or that it was breached," *Lamda Sols.*, 574 F. Supp. 3d at 213. Thus, as with Plaintiff's previous Complaint, the Court again concludes that "in the absence of any allegations of what the offer was . . . Plaintiff cannot plead a claim for breach of an express or implied contract." Dkt. No. 63 at 22.  Plaintiff therefore fails to state a claim for breach of contract with regard to the 2021–22 and 2023–24 Challenges.

### D.    Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff additionally asserts a breach of the implied covenant of good faith and fair dealing in relation to all three alleged contractual arrangements.  SAC ¶¶ 321, 329, 335.  As the Court previously explained, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Dkt. No. 63 at 32 (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).  As in the First Amended Complaint, "Plaintiff has not pled facts to support a free-standing claim of breach of the implied covenant of good faith and fair dealing and even construing his complaint liberally, he has not alleged breach of such a duty" implied in any of the supposed the contracts discussed above.  *Id.*

## V.    Violation of Section 509 of the Communications Act of 1934

Plaintiff alleges that Defendant violated Section 509 of the Communications Act of 1934, 47 U.S.C. § 509, because "NYU operates radio, television and YouTube stations which have participated in prearranging, or predetermining the outcome of The Challenge . . . [by] provid[ing] special and secret assistance to some Challenge contestants over [P]laintiff." SAC ¶¶ 375–376. He also asserts that Defendant "has induced or caused [P]laintiff as a contestant to refrain from using or displaying his knowledge or skill . . . by requiring that he change his business model and by banning him from applying."  *Id*. ¶ 377.  He further alleges that "[t]he outcome of The Challenge was in part prearranged or predetermined to fill gender and other quotas and admit specific applicants with special status ahead of [P]laintiff."  *Id*. ¶ 378.

"Section 509 [of the Communications Act], however, does not create a private cause of action."  *Andrews v. Freemantlemedia N.A., Inc.*, 2014 WL 6686590 at *12 (S.D.N.Y. Nov. 20, 2014), *aff'd* 613 F. App'x 67 (2d Cir. 2015) (summary order); *see also Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1057 ("The Act did not create, even by implication, a cause of action cognizable in the district courts."); *Gordon v. Nat. Broad. Co.*, 287 F. Supp. 452, 455 (S.D.N.Y. 1968) ("But no provision of the Act creates, either by expression or necessary implication, any private right of action which is cognizable, in the first instance, by the district courts."); *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 14 (1942) ("The Communications Act of 1934 did not create new private rights.").

Plaintiff's claim under Section 509 of the Communications Act of 1934 is therefore dismissed.

## VI.    Dismissal With Prejudice

Defendant asks the Court to dismiss Plaintiff's Second Amended Complaint with prejudice.  Dkt. No. 75 at 32.  Generally, district courts should not dismiss a pro se plaintiff's

complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (per curiam) (citation omitted).  But where the complaint, liberally read, suggests that the plaintiff does not merely have a claim that that was inadequately or inartfully pleaded and which may be successfully reframed, but rather that the plaintiff has no viable claim, the court may deny a request to amend as futile.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] causes of action is substantive; better pleading will not cure it" therefore "[s]uch a futile request to replead should be denied.").

Plaintiff "has been afforded several opportunities to amend his complaint;" he is not entitled to yet another.  *Gonzalez v. Rikers Island Warden*, 2018 WL 1283683, at *2 (E.D.N.Y. Mar. 13, 2018); *see Khalil v. Pratt Inst.*, 818 F. App'x 115, 117 (2d Cir. 2020) (summary order) ("[T]he district court's dismissal of the third amended complaint with prejudice was proper because it had previously granted [plaintiff] several opportunities to amend.").  The Court finds that further amendment would be futile and that the case should be dismissed with prejudice.

## VII.    Attorneys' Fees

Defendant's memorandum of law in support of the motion to dismiss requests that the Court enter an order "directing Plaintiff to reimburse NYU for its legal fees incurred for having to defend Plaintiff's frivolous action."  Dkt. No. 75 at 25.  Defendant does not elaborate as to why that request should be granted and does not repeat the request in its reply memorandum of law submitted in further support of the motion to dismiss.  Dkt. No. 81.  The request is denied.  *See Zuma Press, Inc. v. Getty Images (US), Inc.*, 2019 WL 13411214, at *1 (S.D.N.Y. Aug. 23, 2019) ("With respect to Defendant's motion for attorneys' fees, although I dismissed Plaintiffs' claims, I cannot say that the claims and arguments advanced by Plaintiffs were objectively unreasonable,

frivolous, motivated by improper purposes, or otherwise appropriate for an award of attorney fees."), *aff'd*, 845 F. App'x 54 (2d Cir. 2021).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED and Plaintiff's Second Amended complaint is DISMISSED with prejudice.  Defendant's request for attorneys' fees is DENIED.

The Clerk of Court is respectfully directed to close this case.


SO ORDERED.

Dated: September 20, 2024
      New York, New York            _____
                                      LEWIS J. LIMAN
                           United States District Judge